# LIVERPOOL AND GREAT WESTERN STEAM COMPANY *v.* PHENIX INSURANCE COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF NEW YORK.

Argued November 8, 9, 1887. — Decided March 5, 1889.

A decree of the Circuit Court in admiralty on the instance side, finding negligence in the stranding of a ship, can be reviewed by this court so far only as it involves a question of law.

The owner of a general ship, carrying goods for hire on an ocean voyage, is a common carrier.

A common carrier by sea cannot, by any stipulation with a shipper of goods, exempt himself from all responsibility for loss or damage by perils of the sea, arising from negligence of the officers or crew.

Upon a question of the effect of a stipulation exempting a common carrier from responsibility for negligence of his servants, the courts of the United States are not bound by decisions of the courts of the State in which the contract is made.

The general maritime law is in force in this country so far only as it has been adopted by the laws or usages thereof.

The law of Great Britain since the Declaration of Independence is a foreign law, of which a court of the United States cannot take notice, unless it is pleaded and proved.

The law of the place where a contract is made governs its nature, obligation and interpretation, unless it appears that the parties, when entering into the contract, intended to be bound by the law of some other country.

A contract of affreightment, made in an American port by an American shipper with an English steamship company doing business there, for the shipment of goods there and their carriage to and delivery in England, where the freight is payable in English currency, is an American contract, and governed by American law, so far as regards the effect of a stipulation exempting the company from responsibility for the negligence of its servants in the course of the voyage.

An insurer of goods, upon paying to the assured the amount of a loss, total or partial, becomes, without any formal assignment, or any express stipulation to that effect in the policy, subrogated in a corresponding amount to the assured's right of action against the carrier, and may assert that right in his own name in a court of admiralty.

In a through bill of lading for carriage from an inland city in the United States, by a railroad company and its connections, and a steamship company, to an English port, signed by an agent of the companies, " severally, but not jointly," and containing two separate and distinct sets of

terms and conditions, the one relating to the land carriage, and the other to the ocean transportation, a stipulation, inserted in the first set only, that in case of loss that company alone shall be answerable in whose actual custody the goods are at the time, " and the carrier so liable shall have the full benefit of any insurance effected upon the goods," gives the steamship company no right to the benefit of any insurance.

THIS was a libel in admiralty *in personam* "in a cause of action arising from breach of contract," filed January 27, 1881, in the District Court, against the Liverpool and Great Western Steam Company (Limited) by the Phenix Insurance Company, claiming to have been subrogated to the rights of the owners of goods shipped on board the respondent's steamer, the Montana, at New York, to be delivered at Liverpool, and lost or damaged by her stranding in the course of her voyage, through the negligence of those in charge of her navigation. The libel contained the following allegations:

First. The libellant was a corporation duly organized under the laws of the State of New York for transacting business as insurer, among other things, of maritime risks and adventures; and the respondent was a corporation duly organized under the laws of Great Britain and Ireland for the purpose of owning and navigating steamships and carrying passengers and cargo.

Second. The respondent maintained a line of steamers running between New York and Liverpool, and was a common carrier of passengers and cargo between those ports. The Montana was a steamer owned and navigated by the respondent as one of that line, and on March 2, 1880, left the port of New York with a cargo of merchandise and a large number of passengers received on board by the respondent as a common carrier, to be landed and delivered at Liverpool.

Third. Among such cargo were a lot of bales of cotton, variously marked, all shipped by or on account of Swanson, Porteous & Co., to their own order, and a lot of bales of cotton, variously marked, all shipped by or on account of Hobart, Smith & Co., to their own order, and 22 boxes of bacon and 4 tierces of hams, shipped by or on account of A. Baxter, agent, to his own order; all of which goods were shipped on board

the Montana in good order and condition; and the respondent agreed to deliver the same in like good order and condition at Liverpool.

Fourth. The Montana failed to deliver her cargo or any portion of the same as agreed, but, during the prosecution of her voyage from New York to Liverpool, stranded on the west coast of Great Britain, at or near Clegyr Point, in Holyhead Bay, and thereby these goods became in large measure lost or destroyed and the remainder greatly damaged.

Fifth. This article set forth particularly the circumstances preceding and attending the stranding.

Sixth. The libellant charges that the stranding of the steamer and the consequent loss and damage of the cargo were due to the negligence of those navigating the steamer, in proceeding at too high a rate of speed, in not having a sufficient lookout, in going upon an improper and dangerous course, in not making due allowance for the influence of the ebb tide, in not having, or in not using and properly using, the outfit and appurtenances — among other things, the lead and compass — and in not so heeding the shore lights and signals, as would have indicated to them her dangerous position, and would have enabled them to regain and keep in a position of safety.

Seventh. The libellant, before the stranding, had made insurances on the goods in sums equal to or less than their value, to persons having an interest in them respectively equal to or greater than the sums insured, and under such insurances had paid, or become liable to pay, to the assured, for the loss or damage of the goods, sums amounting to more than $15,000. The damages of the assured or their assigns for the loss of the goods were greater than the amount of the insurances. And the libellant was subrogated to all their rights against the respondent for its failure to carry and deliver the goods.

The respondent filed an answer, alleging that it had duly appeared in the cause; admitting the jurisdiction of the court, as well as that the respondent was a British corporation for the purpose of owning and navigating steamers, and of carrying passengers and cargo, and since 1866 had been the owner

of certain steamers, plying between New York and Liverpool, and the Montana was a steamer owned and navigated by it; but denying that it was a common carrier; and alleging that the home port of the Montana was at Liverpool, where she was registered, and where the respondent carried on its business, having an agency, however, in the port of New York.

The answer alleged that the goods were shipped and received on board the Montana under bills of lading, which constituted the contracts between the shippers and the respondent, copies of which were annexed to and made parts of the answer (namely, one for the bacon and hams, weighing nearly six tons, which is printed in the margin,[1] and three for the cotton, amount-

---

[1] Shipped, in good order and well conditioned, by Arch'd Baxter, agent, in and upon the steamship called Montana, now lying in the port of New York and bound for Liverpool, via Queenstown, twenty-two boxes bacon and four tcs. hams, being marked and numbered as in the margin, and are to be delivered from the ship's deck, where the ship's responsibility shall cease, in like good order and condition, at the aforesaid port of Liverpool —

(The act of God, the Queen's enemies, pirates, robbers, thieves, vermin, barratry of master or mariners, restraint of princes, rulers or people, loss or damage resulting from insufficiency in strength of packages, from sweating, leakage, breakage, or from stowage or contact with other goods, or from any of the following perils (whether arising from the negligence, default, or error in judgment of the masters, mariners, engineers or others of the crew, or otherwise howsoever) excepted, namely, risk of craft, explosion or fire at sea, in craft or on shore, boilers, steam or machinery, or from the consequences of any damage or injury thereto, howsoever such damage or injury may be caused, collision, stranding, or other peril of the seas, rivers or navigation, of whatever nature or kind soever, and howsoever such collision, stranding or other peril may be caused, with liberty, in the event of the said steamer putting back to New York, or into any port, or otherwise being prevented from any cause from proceeding in the ordinary course of her voyage, to tranship the goods by any other steamer, and with liberty to sail with or without pilots, and to tow and assist vessels in all situations) —

unto order       or to       assigns, freight for the said goods being paid immediately on landing, without any allowance of credit or discount, at the rate of thirty shillings sterling per ton of 2240 lbs., gross weight,

GUION LINE.

United States Mail Steamers.

NEW YORK:   LIVERPOOL:
29 Broadway.  11 Rumford St.

B.  22 boxes bacon.
    4 tierces ham.
    ——
    26 Packages.

T. cwt. 5.16.0.0 at 30l.
per ton  . . . . £8.14.0
Primage. . . .  8, 9
Total .  . . . £9. 2.9

ing in all to 550 bales and weighing about 123 tons, of which bills one is also printed in the margin[1] and the others were

delivered, with customary primage and general average, if any, according to York-Antwerp rules.

Weight, measure, contents, quality, brand and value unknown. The goods to be taken from alongside by the consignee, immediately the vessel is ready to discharge, or otherwise they may be landed and warehoused at his risk and expense. The collector of the port is hereby authorized to grant a general order for discharge immediately after the entry of the ship. The master porterage of the delivery of the cargo to be done by the consignees of the ship, and the expense thereof to be paid by the receivers of cargo. The owners of the ship will not be responsible for money, documents, gold, silver, bullion, specie, jewelry, precious stones or metals, paintings and statuary, unless bills of lading are signed therefor and the value thereof therein expressed.

In accepting this bill of lading the shipper or other agent of the owner of the property carried expressly accepts and agrees to all its stipulations, exceptions, and conditions, whether written or printed.

In witness whereof the agent of the said ship hath affirmed to three bills of lading, all of this tenor and date, one of which being accomplished the others to stand void.

Dated in New York, March 1st, 1880.                    F. L. Le Sage.

[1] OVERLAND AND OCEAN BILL OF LADING.

| THROUGH BILL LADING No. 81. | LOUISVILLE AND NASHVILLE RAILROAD |
| --- | --- |
| | AND THE WILLIAMS AND GUION STEAMSHIP COMPANY FROM NASHVILLE, TENN., TO LIVERPOOL, ENG. |

| FREIGHT.<br><br>From Nashville, Tenn.<br>To Liverpool, Eng.<br>Quantity, 73,769 pounds.<br>Amount, £_____ | SHIPPED in apparent good order, by GILBERT PARKES & Co., the following property, marked and numbered as below (contents of packages unknown, and weight subject to correction). | |
| --- | --- | --- |
| | MARKS. | ARTICLES. |
| | H. E. N.   45 bales.<br>D. U. D.   45   "<br>H. E. L.  .60   " | One hundred and fifty bales cotton. |

To be delivered in like good order and condition, unto order Gilbert Parkes & Co., or to their assigns, he or they paying freight, in cash, immediately on landing the goods, without any allowance of credit or discount, at the rate of fifty-four pence (stg.) per 100 lbs. gross weight, delivered with average accustomed (at $4.80 to the Pound Sterling) under the following terms and conditions, viz.:

substantially similar); that the respondent assumed no greater risks or responsibilities than were expressed in the bills of lad-

That the said LOUISVILLE & NASH-VILLE RAILROADS and their connections which receive said property shall not be liable for breakage of packages of Eggs, or for rust of Iron and of Iron articles, or for loss or damage by wet, dirt, fire, or loss of weight, or for condition of baling on Hay, Hemp or Cotton; nor for loss or damage of any kind on any article whose bulk requires it to be carried on open cars; nor for damage to perishable property of any kind occasioned by delays from any cause or by changes of weather; nor for loss or damage on any article or property whatever by fire or other casualty while in transit, or while in deposit or places of transhipment, or at depots or landings at all points of delivery; nor for loss or damage by fire, collision, or the dangers of navigation while on seas, rivers, lakes or canals. All goods or property under this Bill of Lading will be subject to its owner's cost to necessary cooperage or baling, and is to be transported to the depots of the Companies or landings of the Steamboats or Forwarding Lines at the points receipted to, for delivery.

IT IS FURTHER AGREED, that said LOUISVILLE & NASHVILLE RAILROAD and connections shall not be held accountable for any damage or deficiency in packages after the same shall have been receipted for in good order by consignees, or their agents, at or by the next carrier beyond the point to which this Bill of Lading contracts. Consignees are to pay freight and charges upon the goods or merchandise in lots or parts of lots, as they may be delivered to them.

IT IS FURTHER STIPULATED AND AGREED, that in case of any loss, detriment, or damage done to or sustained by any of the property herein receipted for during such transportation, whereby any legal liability or responsibility shall or may be incurred, that Company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of such loss, detriment or damage, and the carrier so liable shall have the full benefit of

To be delivered from the Ship's deck, where the Ship's responsibility shall cease, in the like good order and condition at the aforesaid port of Liverpool (the acts of God, the Queen's enemies, pirates, robbers, thieves, vermin, Barratry of Master or Mariners, restraints of Princes, Rulers or People, Loss or Damage resulting from insufficiency in strength of packages, sweating, leakage, breakage, stowage, or contact with other goods, risk of craft, explosion, or fire at sea, in craft or on shore, before lading or after unlading, accidents from machinery, boilers, steam, or any other accidents of the seas, rivers and steam navigation, of whatever nature or kind soever, excepted; whether any one or more of all such exceptions arise, occur, or are in any way occasioned from or by the negligence, default, or error in judgment of the Master, Mariners, Engineers, or others of the Crew, or of any of the Servants or Employés of the Ship-owners, or otherwise, however); and with liberty during the voyage to call at any port or ports, to receive Fuel, to load or discharge Cargo, or for any other purpose whatever; to sail with or without Pilots, to tow and assist vessels in all situations, and in the event of the said steamer putting back to New York or into any other port, or being otherwise prevented from proceeding in the ordinary course of the voyage, to tranship the goods to any other steamer.

Weight, Length, Contents and Value unknown; and not answerable for Leakage, Breakage, Rust or Mortality, damage caused by heavy weather, or pitching or rolling of the vessel, heating, mold, inherent deterioration, or defective package, or wrong delivery, caused by error, indistinctness, illegibility or deficiency in the marks, brands or numbers. Where goods are weighed or measured on board to ascertain freight, the charges for weighing, etc., to be paid by the consignee, and the Ship-owner to have a lien on the goods for such charge. The consignees, or the parties applying for the goods, are to see that they get their right marks and numbers, and after the lighterman or wharfinger, or the party applying for the goods, has signed for the same, the ship is to be discharged from all responsibility for misdelivery or nondelivery, and from all claims under this Bill of Lading. The ship to be entitled to commence

Statement of the Case.

ing; and that the goods were lost or damaged by perils of the sea and by causes from which the respondent was exempt by law and by the bills of lading.

The answer denied any negligence on the part of those navigating the Montana, as charged in the libel; set forth particu-

any insurance that may have been effected upon or on account of said goods.

AND IT IS FURTHER AGREED, that the amount of the loss or damage so accruing, so far as it shall fall upon the carriers above described, shall be computed at the value or cost of said goods or property at the place and time of shipment under this Bill of Lading.

THIS CONTRACT is executed and accomplished and the liability of the LOUISVILLE & NASHVILLE RAILROADS and their connections, as common carriers thereunder, terminates on delivery of the goods or property to the Steamship Company at New York, when the liability of the Steamship commences, and not before.

AND IT IS FURTHER AGREED, that the property shall be transported from the port of New York to the port of Liverpool by the said Steamship Company, with liberty to ship by any other Steamship or Steamship Line, subject to the following terms and conditions, viz.:

discharging immediately she arrives. The goods to be taken from the ship by the consignees directly they come to hand in discharging the ship, otherwise the Master or Ship's Agent to be at liberty to enter and land the goods or put them into craft at the merchant's risk and expense, and to have a lien on such goods until the payment of all costs and charges so incurred. The ship's responsibility to cease immediately the goods are discharged from the ship's deck.

The owners of these Steamships will not be accountable for Gold, Silver, Bullion, Specie, Jewelry, Precious Stones or Metals, Statuary or Paintings, unless specified in the Bills of Lading signed therefor, and the value thereof therein expressed.

☞ Parcels for different consignees collected and made up in single packages, addressed to one party for the purpose of evading payment of parcel freight, will be charged with the proper freight on each parcel.

NOTICE.—In accepting this Bill of Lading, the Shipper or Agent of the owner of the Property carried expressly accepts and agrees to all its stipulations and conditions, whether written or printed.

In Witness Whereof, The Agent signing for the said Transportation and Steamship Companies hath affirmed to Three Bills of Lading, of this tenor and date, one of which being accomplished, the others to stand void.

B. F. CHAMPE,

Agent Severally, but not Jointly.

Dated in Nashville, Tenn., Feb. 5, 1880.

[Along the left hand margin were printed the following:]

Bonded Goods, Consignee to Furnish Landing Certificates free of Expenses, and on all Shipments of less than 5 Car Loads Bonding Charges will be Collected.

ATTENTION OF SHIPPERS IS CALLED TO THE ACT OF CONGRESS OF 1851:

"Any person or persons shipping Oil of Vitriol, Unslacked Lime, Inflammable Matches, Gunpowder, in a ship or vessel taking cargo for divers persons on freight, without delivering AT THE TIME OF SHIPMENT a note in writing, expressing the nature and character of such merchandise, to the master, mate, or officer, or person in charge of the loading of the ship or vessel, shall forfeit to the UNITED STATES ONE THOUSAND DOLLARS."

larly the circumstances preceding and attending the stranding; and alleged that in respect to the employment of a skilled and licensed master and officers, and the careful observation by them of the elements and everything which would, in the exercise of ordinary human skill, enable them to determine and judge the position of the vessel and to navigate her accordingly, and in respect to her seaworthiness and outfit and everything within the reasonable limits of skill and foresight, the respondent fully complied with its contract of affreightment, and with all the requirements of law.

As to the allegations of the libel concerning insurance and subrogation, the answer averred that the respondent had no knowledge, and left them to be proved.

In the District Court, the pleadings and depositions were read in November, 1882, the cause was argued and submitted May 4, 1883, an opinion in favor of the libellant was delivered June 29, 1883, which is reported in 17 Fed. Rep. 377, and a final decree for the libellant for the sum of $13,257.64, with interest and costs, was entered February 19, 1884.

The respondent appealed to the Circuit Court, where the cause was heard and argued July 1 and 2, 1884, upon the testimony taken in the District Court; and on July 31, 1884, the court rendered an opinion in favor of the libellant, and filed its findings of fact and conclusions of law, all of which are reported in 22 Blatchford, 372. The findings of fact were as follows:

"The respondent, The Liverpool and Great Western Steam Company (Limited), is a corporation organized under the laws of Great Britain, and, in the month of March, 1880, and for a long time prior thereto, was the owner of the steamer Montana. The libellant, The Phenix Insurance Company, has been for many years, and still is, a corporation duly organized and existing under and by virtue of the laws of the State of New York for transacting the business of insurance, including marine risks. During said time it had an agency in Liverpool, England, for the adjustment and settlement of losses, and the losses referred to herein were adjusted by such agency, and were paid by it in Liverpool. The Montana was an ocean steamer,

built of iron, and performed regular service as a common carrier of merchandise and passengers between the ports of Liverpool, England, and New York, in the line commonly known as the Guion Line.  By her, and by other ships in that line, the respondent was such common carrier.

"On March 2, 1880, the Montana left the port of New York, on one of her regular voyages, bound for Liverpool, England, with a full cargo, consisting of about twenty-four hundred tons of merchandise, and with passengers.  She stopped at Queenstown in the afternoon of March 12, and thence proceeded on her voyage.  She passed Tuskar rock, on the extreme southeastern portion of Ireland, at about eight o'clock in the evening of March 12, and thence took a course up and across the Irish Channel.  The course she took would ordinarily have carried her outside of the range of the South Arklow light, which is a light on the east coast of Ireland, but, with the wind, tides and currents as they were that night, she passed within range of that light, and about nine miles off, at 9.45 P.M.  On passing the South Arklow light, the next light which those in charge of the navigation of the Montana expected to make was the South Stack light, on the coast of Wales, at the entrance of Holyhead Bay.  The master of the Montana was on the bridge and in charge of her navigation.

"The light-house on South Stack carried two lights.  One, the high light, was about 170 feet above high water.  It was white in color, and exhibited in all directions at sea, with a range of from twenty to thirty miles, in clear weather.  It was a revolving light, making one complete revolution in six minutes, and it showed a white flash light every minute.  The other light was also white.  It was about 40 feet above high water, and was a semi-revolving light, exhibiting every minute and a half in all directions between east northeast and west by north.  Its range in clear weather was from three to four miles, but it was regularly lit only in foggy or thick weather.  Both of these lights were lit and burning all through the night of March 12.  A fog-bell was regularly sounded at South Stack from ten o'clock in the night of March 12 until six o'clock in the morning of March 13.  The bell weighed two and a quarter

tons, and was operated upon by a hammer weighing about ninety-six pounds, which struck the bell on the outside at intervals of fifteen seconds, and was worked by means of clock-work and a caloric engine. The sound was a powerful one, and its range was from three to four miles. The high light on the South Stack was established in 1809, and has ever since been regularly maintained. The fog-bell has been established for about twenty years, and has since then been regularly sounded in foggy weather.

"About east northeast, magnetic, from South Stack, and distant about one mile therefrom, was a fog-gun station, known as North Stack. This fog-gun station had been established about twenty years, and from midnight of March 12 until four o'clock in the morning of March 13 the fog-gun was fired regularly every ten minutes. The gun was a twenty-four pounder, and was each time charged with three pounds of powder, and a large junk wad to give extra sound, the range of the sound being between five and six miles when the fog was thick, with the wind, and about seven miles when the fog lifted. The fog-gun station, since it was established, has been regularly maintained and the fog-gun fired regularly in foggy weather.

"About two miles east, magnetic, from North Stack, was the Holyhead Breakwater light-house. This light-house was at the outer end of Holyhead Breakwater, and it carried a fixed red light at a height of from sixty to seventy feet above high water, with flashes every seven and one half seconds. The range of the light in clear weather was from three to four miles, and the range of the flash was about fourteen miles. The light was established in 1873, and has since then been regularly maintained. At the breakwater light-house was a fog-bell, weighing about five hundred weight, which was operated upon by two hammers, worked by clock-work, and striking the bell on the outside three times in quick succession at intervals of fifteen seconds. The range of the sound was from a mile and a half to two miles. The bell was established in 1873, and was regularly rung in foggy weather. It was in operation from midnight of March 12 until five o'clock in the morning of March 13.

"About five miles north northeast, magnetic, from Holyhead Breakwater light-house, and across Holyhead Bay, was the Skerries light-house. The Skerries light-house was about northeast, magnetic, from South Stack light-house, and distant therefrom between seven and eight miles. It was situated on a small island about two miles off Carmel Head, and about two or three miles north northwest, magnetic, from Church Bay. It carried a stationary white light between eighty and ninety feet above low-water mark, exhibiting in all directions at sea and in Holyhead Bay, with a range of about sixteen miles. It was burning all through the night of March 12. It was established between seventy and eighty years ago, and has been regularly maintained since. There was at Skerries light-house a fog-horn or siren, worked by two powerful caloric engines at a pressure of fifty pounds to the square inch. The sound made was shrill and powerful, and had a range of eight miles in foggy weather, and the sound was regularly given from ten o'clock at night of March 12 until half past four o'clock in the morning of March 13, at intervals of three minutes. This fog-horn or siren had been established for several years, and it has been regularly maintained ever since.

"All through the night of March 12, until five o'clock in the morning of March 13, a fog overspread the land surrounding Holyhead Bay, and extended, at times, and to some extent, into the bay and out to sea. The proper course of the Montana was to keep three or four miles off the land at the South Stack, and on a course about northeast by east, magnetic, until she had the Skerries abaft her beam, and then to take a course about east by south, magnetic, to Liverpool. There was a westerly variation of about two points between magnetic courses and true courses in the Irish Channel and adjacent waters.

"The Montana, on a course about northeast by east, magnetic, passed within a short distance of South Stack light-house and saw the high light there between one and two o'clock in the morning of March 13. It came into sight, bearing about southeast by east and about one point forward of the starboard beam of the Montana. Her officers expected to see it at a

distance of about twenty miles off, bearing from east northeast to northeast by east. When they saw it first, they thought it to be fifteen miles off, and they remained of that opinion. It passed out of sight abaft their beam, they supposing it was hidden by the horizon. The master of the Montana did not ascertain by cross bearings (which he might readily have made) the distance at which he was from the light. He lost the light because it was shut out from him by a fog which intervened between it and the Montana; and thence he continued, with his engines working at full speed, and giving the Montana a speed through the water of about fourteen knots an hour, and on an east three-quarters south magnetic course, to which he had changed, which took him directly into Holyhead Bay, until after half past two o'clock. Before this time a man had been stationed at the fog whistle of the Montana, who regularly blew it. At about half past two o'clock the master of the Montana heard the fog-gun on North Stack off his starboard quarter, abaft his starboard beam, and he thereupon changed the course of the steamer again to northeast by east magnetic, but he continued his engines at full speed until 2.45 A.M., at which time the engines were put at half speed, which gave the steamer a speed through the water of between nine and ten knots per hour. Five minutes later the shore loomed up through the fog on the starboard bow, and orders were given to slow and stop the engines and to put them full speed astern, but before these latest orders could be executed the Montana ran ashore at Clegyr Point, in Church Bay. After leaving Tuskar, and up to one o'clock in the morning of March 13, the Montana was running with a flood tide. Then there was slack water, and she afterward encountered an ebb tide, which ran from three to four knots an hour.

"At no time that night were any soundings taken on board of the Montana, though soundings would have indicated to her master that he was running rapidly on to the shore. The lights at Holyhead Breakwater and the Skerries were not seen by those in charge of the navigation of the Montana and her lookouts, and those in charge of her navigation did not hear the fog-bell at South Stack or that at Holyhead Breakwater or the

siren at the Skerries, and they did not hear the fog-gun at North Stack until it was on their quarter. When they lost sight of the South Stack light, they were within range of the Skerries light, and ought to and would have seen it unless it was shut out by a fog. The water outside of Holyhead Bay ranged from twenty to eighty fathoms in depth, while the water in Holyhead Bay ranged from five to seventeen fathoms in depth, regularly shoaling as the shore was approached.

"Almost immediately after the Montana ran ashore, she commenced filling with water, and thereby her cargo was in large part destroyed or damaged. Portions of it were thereafter taken from the steamer and forwarded to Liverpool, and there delivered. The Montana was then floated and taken to Liverpool for repairs.

"Those in charge of the navigation of the Montana were negligent, in that, without having taken cross bearings of the light at South Stack, and so determined their distance from the light, they took an east three-quarters south course before passing the Skerries, and without seeing the Skerries light; and in that they continued at full speed after hearing the fog-gun at North Stack; and in that they took a northeast by east magnetic course on hearing said fog-gun, instead of stopping and backing and taking a westerly course out of Holyhead Bay; and in that they did not ascertain their position in Holyhead Bay by means of the lights and fog-signals, or by the use of the lead, or by stopping until they should, by those means or otherwise, learn where their ship was."

The substance of the rest of the findings of fact and of the documents made part thereof was as follows:

The bacon and hams were owned by Jessie Baxter, of Brooklyn, in the State of New York, and were shipped at New York, and the insurance obtained, on her account, by Archibald Baxter, agent. Part of the cotton was owned by Gilbert Parkes & Co., merchants, of Nashville in the State of Tennessee, shipped by them at Nashville, and at or after the date of shipment sold by them to Hobart, Smith & Co., merchants, of the city of New York, who obtained the insurance thereon. The rest of the cotton was owned by Swanson, Porteous & Co.,

merchants, of the city of New York, and was shipped on their account at Nashville, and the insurance obtained by them. All the goods were shipped under the bills of lading annexed to the answer, and were insured at their value by the libellant against perils of the seas and other usual marine risks, including "barratry of the master and mariners, and all other perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods and merchandises, or any part thereof;" and were damaged by the stranding. And the libellant afterwards, upon due adjustment of the general and particular average, paid to the assured or their assigns, in settlement of the insurance, various sums of money, amounting in all to £2720. 3s. 3d. in successive instalments, most of which were paid before the filing of the libel, and the rest within a year afterwards and before the argument of this case in the District Court.

The Justice presiding in the Circuit Court stated his conclusions of law as follows:

"On the foregoing facts, I find the following conclusions of law: The stranding of the Montana and the consequent damage to her cargo having been the direct result of the negligence of the master and officers of the steamer, the respondent is liable therefor. The libellant was duly subrogated to the rights of the insured against the carrier for the damage to the cargo insured by the libellant, and is therefore entitled to recover from the respondent the amount of such damage. The libellant is entitled to a decree against the respondent for the following sums:" specifying the sums paid by the libellant, amounting in all to $13,237.64, with interest and costs.

The Circuit Court entered a final decree accordingly on August 21, as of August 16, 1884, and the respondent appealed to this court; and on September 2, 1884, the Circuit Court allowed the appeal, as well as a bill of exceptions tendered by the respondent to each of the court's conclusions of law, and to its refusal to make each of the following conclusions of law proposed by the respondent at the hearing:

"First. The respondent was not a common carrier in respect to the goods in question.

"Second. It was only a ship carrier, having the right to reject, both by the laws of Great Britain and this country, the carriage of any goods offered to it.

"Third. The respondent is fully protected by virtue of the exceptive clauses in the bills of lading. In respect to a part of the cargo so shipped, the carrier is to have the benefit of any insurance effected by the shipper. The libellant, having paid the loss, therefore, can maintain no action against the carrier. The respondent furnished the carrier with a seaworthy vessel, well equipped and appointed, with most experienced officers, who were carefully and vigilantly attending to their duties, together with a double and careful lookout at the time the ship stranded. No neglect can therefore be charged against the respondent.

"Fourth. The cause of the action was the capricious fog, which settled under the South Stack light, and which rising shut out the light and led the officers to suppose that it was 'dipping' below the horizon and they were not within its range. This cannot be considered an error of judgment, but, if an error of judgment, there has been no case of neglect made out sufficient to charge the respondent.

"Fifth. The mere payment of the loss by the insurance company will not entitle it to a recovery, unless if subrogated, or it appears that there was an express agreement or assignment, which does not appear."

The return to a writ of *certiorari*, granted by this court upon the appellee's suggestion of a diminution of the record, contained the following :

First. A motion, filed in the Circuit Court, August 6, 1884, in behalf of the respondent and on the oath of one of its proctors, stating that it "contends that the question of its liability is governed by, and should be decided under, the law of Great Britain," and that by that law it would be exempt from liability to the libellant; further stating that no proof of that law had been made, because it was understood that the same was recognized by the libellant, and formal proof of it would not be required, and in the District Court the question was argued and British statutes and reports of decisions re-

ferred to, without objection on the part of the libellant, yet the libellant, in the Circuit Court and for the first time, made the point that the proof had not been made, and that court in its decision held the point well taken ; and praying that the respondent might be permitted to amend its answer, by averring the existence of that law and its applicability to this suit, and by qualifying the appearance, and the admission of jurisdiction, in this particular, and be also permitted to prove that law in the Circuit Court.

Second. The new answer, proposed to be filed, amending the original answer by qualifying both the allegation that the respondent had duly appeared, and the admission of jurisdiction, by adding "without prejudice to its right to rely upon the hereinafter mentioned law of Great Britain as a ground of defence to the said libel;" and further amending that answer by inserting distinct allegations, "that the said steamer at the time of the said accident was sailing under the flag of Great Britain;" "that the law of Great Britain, at all the times mentioned in the said libel, enabled ship-owners by express contract to exempt themselves from liability for the consequences of any damages or injury to goods transported or carried on their ships, howsoever the same might have been caused, whether arising from negligence, default, or error in judgment of the master, mariners, engineers, or other of the crew, or otherwise;" "that, by the contracts for the transportation or carriage of the goods claimed to have been lost or damaged by the libellant, the respondent had expressly, and in conformity with the said law, exempted itself from any liability whatsoever;" and "that the said contracts were subject to and governed by the said law."

Third. The opinion of the Circuit Court against the motion, delivered August 21, 1884, and reported in 22 Blatchford, 399–404.

Fourth. The order of the Circuit Court, denying the motion, entered September 1, 1884.

*Mr. Franklin A. Wilcox* and *Mr. Stephen P. Nash* for appellant.

I. Upon the facts found, the loss was due to error in judgment, not to negligence on the part of those navigating the steamer.

It is quite clear that if the vessel had been where the officers supposed she was, when the light was first seen, fifteen miles off shore, the casualty would not have happened. The negligence imputed is based upon the notion that the officers ought to have distrusted their convictions when they first saw the South Stack light, and verified them by cross bearings and soundings, or stopped when the fog set in until they " should, by these means or otherwise, learn where their ship was." This was very easy to say after the event. These officers were navigators of experience, familiar with the channel; their positions, as servants of the company, and in their calling, were at stake, possibly their lives, as well as the valuable vessel and cargo in their charge. It is submitted that the evidence was not sufficient to justify the finding of negligence, with the consequences which such a finding involved. *The Adriatic*, 17 Blatchford, 194.

II. The owners of the steamer had the right to contract to limit their liability for loss or damage to cargo caused by error of judgment or neglect of the master or mariners of the vessel, and their contract in that respect was valid and effectual.

This risk was an insurable risk, and there is no pretence that the owners were guilty of negligence. Assuming that there was negligence on the part of the master and officers of the vessel, the simple question for the court to determine is whether a carrier on the high seas is responsible to the insurer for accidents caused by the negligence of the master, and which come within the risks insured against. Lord Bramwell in *Grill* v. *General Iron Screw Co.*, L. R. 1 C. P. 476, 480, says, " There is nothing unreasonable in a ship-owner, having once put on board a competent captain and crew, stipulating that he will not be responsible for accidents arising from their negligence, the owner of the goods having a remedy against the underwriters." This is the proposition which the appellant maintains.

(1) This is settled law in New York, the place where the

contract was made. *Maynard* v. *Syracuse Railway Co.*, 71 N. Y. 180, 184; *Spinetti* v. *Atlas Steamship Co.*, 80 N. Y. 71. See also *Perkins* v. *N. Y. Central Railroad*, 24 N. Y. 196, 216; *S. C.* 82 Am. Dec. 281; *Mercantile Mutual Ins. Co.* v. *Calebs*, 20 N. Y. 173; *Smith* v. *N. Y. Central Railroad*, 24 N. Y. 222; *Bissell* v. *N. Y. Central Railroad*, 25 N. Y. 442; *S. C.* 82 Am. Dec. 369; *Dorr* v. *New Jersey Steam Navigation Co.*, 11 N. Y. 485; *S. C.* 72 Am. Dec. 125; *Wells* v. *N. Y. Central Railroad*, 24 N. Y. 181; *Cragin* v. *N. Y. Central Railroad*, 51 N. Y. 61.

(2) The contract was to be chiefly performed on board of the vessel, a part of British territory, a floating island of Great Britain. *Lloyd* v. *Guibert*, 6 B. & S. 100; *S. C.* L. R. 1 Q. B. 115. It was to be finally executed in the British port of Liverpool, and the place where the breach took place and the loss happened was within the territorial limits of Great Britain. The law of Great Britain is in harmony with the law of New York. *Lyon* v. *Mells*, 1 J. P. Smith, 478, 484; *Nicholson* v. *Willan*, 5 East, 507; *Maving* v. *Todd*, 1 Starkie, 59; *Leeson* v. *Holt*, 1 Starkie, 148; *York, Newcastle &c. Railroad* v. *Crisp*, 14 C. B. 527; *Taubman* v. *Pacific Co.*, 26 Law Times (N. S.), 704; *The Duero*, L. R. 2 Ad. & Ec. 393.

(3) The rights of the parties under the bill of lading are to be governed by the law of Great Britain and the general maritime law.

The leading case in this country is *Pope* v. *Nickerson*, 3 Story, 465, decided by Judge Story in a very learned and extensive opinion. There the court holds that the law of Massachusetts, to wit, the domicil of the owners of the vessel, would control, in respect to a vessel which was owned in the State of Massachusetts, but received cargo at a Spanish port to be carried to Philadelphia, and had put into Bermuda in distress, where it became necessary to execute bottomry out of which a suit arose to charge the owners of the vessel on their general liability. The law of Massachusetts limited their liability in respect thereto, while the law of Pennsylvania did not, nor, we believe, the law of Spain.

The leading English case, decided in 1864, *Lloyd* v. *Guibert*,

*ubi supra*, cites with approval *Pope* v. *Nickerson*.  In that case a French vessel, having a French register and carrying the French flag, and owned by persons domiciled in France, was chartered in St. Thomas, a Danish port, to go to Hayti, and carry cargo from there to Liverpool.  In the progress of her voyage she was obliged to put into Fayal in distress, where the vessel, freight and cargo were bottomried.  The vessel was thereby enabled to complete the voyage and to discharge her cargo in Liverpool, where the vessel, freight and cargo were libelled, and the owners of the cargo were obliged to pay on account of the bottomry to release their cargo.  The vessel and freight were sold by decree in admiralty and thus abandoned by the owners.  By the law of Great Britain, the owner's liability was not limited.  The owners of the cargo brought a suit against the French owners of the vessel, but the court held that the law of the domicil of the owners of the vessel controlled.  The case went up on appeal and was decided in November, 1865, before the Exchequer Chamber, L. R. 1 Q. B. 115, the judgment below being affirmed.  The opinion of the court is most interesting, and is exhaustive of the subject.

*The Moxham*, English L. R. 1 P. D. 43; *S. C.* on appeal, Id. 137.  An English joint stock company possessed a pier at Malaga, Spain, and instituted a cause of damage against an English steamship which, by the negligence of those in charge, had come into collision with and damaged the pier.  The owners of the steamship filed an answer, and alleged, *inter alia*, that the pier formed part of the land of Spain, and that by the law of Spain the master and mariners were alone answerable for the damage.  On motion to reject this portion of the answer, it was held that the law of Spain was not applicable; and that by the statutory law of Great Britain a vessel was liable for any damage.

The present case, if considered as an action of tort, would, under this doctrine, be governed by the law of Great Britain. *Pritchard* v. *Norton*, 106 U. S. 124.

*Kentucky* v. *Bassford*, 6 Hill, 526, was an action upon a bond, conditioned for the faithful performance of duties enjoined by the law of Kentucky, which authorized the obligees

to sell lottery tickets for the benefit of a college in that State; it was held that the stipulations of the bond were to be performed in Kentucky, and that, as it was valid by the laws of that State, the courts of New York would enforce it, notwithstanding it would be illegal in the State of New York. See also *The Avon*, 1 Brown's Adm. 190.

In *Wayman* v. *Southard*, 10 Wheat. 1, 48, Chief Justice Marshall declares the law to be "that in every *forum* a contract is governed by the law with a view to which it was made."

In *Lloyd* v. *Guibert, ubi supra*, it is said that "it is necessary to consider by what general law the parties intended that the transaction should be governed, or rather by what general law it is just to presume that they have submitted themselves in the matter." See also 4 Phillimore, Int. Law, 469; *Crapo* v. *Kelly*, 16 Wall. 610, 626.

There is such a concurrence of authority sustaining the validity of these exemptions, that a contrary rule from this court, especially if applied to ocean transportation, would lead to confusion. In *Carr* v. *Lancashire &c. Railway*, 7 Exch. 707 (1852); *Austin* v. *Manchester &c. Railway*, 10 C. B. 454 (1850); and *Walker* v. *York &c. Railway*, 2 El. & Bl. 750 (1853), the three common law courts of England concurred in sustaining the validity of such contracts. See, also, *Great Western Railway* v. *McCarthy*, 12 App. Cas. 218.

In 1854 Parliament enacted a law to regulate such contracts, when made by railroad companies; but it has not interfered with the freedom of contract in matters of ocean transportation. The cases of *Peninsular & Oriental Co.* v. *Shand*, 3 Moore P. C. (N. S.) 272 (1865); *The Duero* (1867–8), cited above; and *Taubman* v. *Pacific Co.* (1872), cited above; and *Chartered Bank &c.* v. *Netherlands &c. Co.*, 10 Q. B. D. 521 (1883), are cases in respect to ocean transportation in which the validity of such exemptions was sustained. In *Taylor* v. *Great Western Steamship Co.*, L. R. 9 Q. B. 546, the defendants were held liable because the words of exemption, as construed by the court, did not cover the case; but it was not hinted by counsel, or by either of the judges, that the exemptions were invalid.

, (4) The continental authorities also fully support our, position as to the right to make this contract to limit liability.

The first draft of the Commercial Code of Germany prohibited all contracts limiting the liability of common carriers, as laid down in that code. The second draft expressly stated that such prohibition should not apply to any common carriers, except railroads. This provision gave rise to a long discussion between the railroads who were opposed to the section, and the general commercial interests which favored it. As a compromise, nothing was said in the code, as it finally passed, about other common carriers, and the prohibition was applied to railroads, but considerably modified, and in a less stringent form. (See foot-note to 3 Endemann, Handbuch des Deut-, schen Handelsrecht, 485, 1884.)

Under the law as it now stands, it has been expressly decided by the Supreme Imperial Court of Commerce that common carriers, other than railroads, are at liberty to make such contracts limiting their liability. See the case of *Hamburg Am. Packet Co.* v. *Johns*, 25 Entscheidungen des Reichs-oberhandelsgerichts, 181.

The same doctrine is held in France. *Duclos* v. *Messageries Maritimes*, at the Court of Appeal at Aix, March 16, 1875 ; *S. C.* in the Cour de Cassation, March 14, 1877, 1 Dalloz, 449, 450 ; *Le Normant* v. *Compagnie Générale Transatlantique*, in the Court of Appeal at Rouen, Journal du Palais (1877), 1154 ; *S. C.* in the Cour de Cassation, April 2, 1877, Journal du Palais (1878), 742 ; *British India Steam Co.* v. *Stora*, in the Cour de Cassation, July 23, 1878, Journal du Palais (1879), 1092 ; *Teissier* v. *Compagnie Générale Transatlantique*, in the Court of Appeal of Algeria, December 26, 1881, Journal du Palais (1883), 83 ; *Levy* v. *Compagnie Générale Transatlantique*, in' the Cour de Cassation, January 22, 1884, Journal du Palais (1884), 534.

[The brief contained translations of the judgments in these cases at length. The judgment in *Le Normant* v. *Compagnie Générale Transatlantique*, in the Cour de Cassation, was as follows, as translated in the brief.]

" WHEREAS as a matter of fact, by taking the engagement by

the bill of lading of the 3rd April 1874, to convey from New York to Havre the goods shipped on board the Amérique, the Compagnie Générale Transatlantique has formally excepted the acts of God, of the enemies, pirates, fire at sea and on land, accidents arising from the machinery, the boilers, the steam, and all other accidents at sea occasioned by the negligence or the mistakes of the captain, of the crew or of the engineer, whatever may be the nature of these accidents, and their consequences.

"Whereas no law prohibits ship-owners from stipulating that they do not answer for the fault of the captain or those of the crew; that such a convention is not contrary to public order or to morality; that, as a matter of fact, although in admitting that public order and morality would not allow a person, in principle, to exonerate himself from the mistakes committed by his employés, and if it be true that the captain is the servant or subordinate of the ship-owner, it is equally true that, in the exercise of his command, the captain escapes, in fact and in law the authority of his principal and his supervision; and, for that reason, the captain is made answerable by articles 221 and 222 of the Code of Commerce, and has an inherent and direct responsibility, and for the same reason article 353 of the same code, whose general terms make no distinction, allows ship-owners as well as the simple shippers to insure against all faults and omissions of the captain or the crew known under the name of the master's barratry.

"Consequently, by declaring valid in this case the clause of the bill of lading by which the Company defendant declined any responsibility for the fault or negligence whatever, imputable to the captain, the crew or the engineers, the contested decision has not transgressed any law."

Section 416 of the Nuovo Codice di Commercio of Italy is as follows:

"In the contract of carriage by railway stipulations that exclude or limit the obligations or the responsibilities by §§ 392, 393, 394, 400, 402, 403, 404, 405, 407, 408, 411 and 415, are null and of no effect, even if permitted by general or

special rules except when, in consideration of the limitation of liability, there should be correspondingly offered by special rates a diminution in price from the price established in the ordinary rates."

This code contains two other sections which are also made by the Court of Cassation the basis of its argument for a decision in favor of our contention. Section 491 relates to that well-known article of the Continental maritime law, whereby owners of vessels can relieve themselves of their personal responsibility for the acts of the master or other agents by abandoning the vessel to the creditors. The other section is 618, wherein barratry is allowed to be made a subject of insurance. Those sections being as above stated, and the spirit of the law being as above shown, a case came up directly on the point, and was decided in favor of the views taken by the appellants herein, in the first instance and subsequently by the Court of Appeals of Lucca, on the 16th of October, 1885, and then by the Court of Cassation on the 14th of June, 1886. The following is a translation of an extract from the judgment in the Court of Cassation :

" All that is to be examined is, if in a contract for maritime transportation, a stipulation that exempts or limits the responsibility of the owner of the vessel for the default or negligence of the master or of the crew, is valid and obligatory ; in other words, if the clause inserted in the bill of lading by which it is agreed that the owner of the vessel is not to be responsible for the default or negligence of the master or of the crew is valid and obligatory.

" Such question was resolved by the court hearing the merits in the sense sustaining the validity.

" Indeed there is no disposition of law from which there could be inferred, whether indirectly or by analogy, a prohibition of the stipulation mentioned."

In Holland the liability of common carriers is laid down in § 91, of the Code of Commerce. " Carriers and masters of ships are responsible for all damage to the wares and merchandise transported by them, except what is caused by the nature of the goods, by the act of God, or by negligence

of the sender." This section is expressly made applicable only to carriers by land and inland navigation. No such strict liability is, by the terms of the statute, imposed on other carriers.

Even as to those carriers to whom this section is applicable, the Court of Appeals in a decision of the 21st June, 1861, held that parties were entirely at liberty to limit the strict liability imposed by law, and that such contracts were not against public policy. See 2 Cremers Aanteekeningen op de Nederlandische Wetboeken, 111, pl. 977. This decision has been followed repeatedly by other courts. Utrecht, 24th March, 1874, Weekblad van het Recht, No. 3732. Rotterdam, 29th January, 1881, Paleis van Justitie, 1881, No. 17.

(5) The point now raised is not controlled by decisions of this court. The two which bear most directly on the question are *Railroad Co.* v. *Lockwood*, 17 Wall. 357, and *Hart* v. *Pennsylvania Railroad*, 112 U. S. 331.

These cases both differ from the case at bar in the fact (whatever may be its significance) that the carriers were inland carriers, railroad companies exercising their functions under public authority.

They differ from each other in the fact that in the earliest, a stipulation in the contract of carriage for an exemption from liability for negligence was held void; in the other, such a stipulation was held valid.

The two cases appear to be reconciled by the view stated in both, that the validity of the exemption turns in every case upon the fact whether it is or is not, in the case presented to the court, "just and reasonable."

In *Railroad Co.* v. *Lockwood*, the action was for personal injuries to a passenger, which were found by the jury to have been caused by the negligence of the Railroad Company whose defence was that by the terms of the contract it was exempt from liability. The opinion states the question thus: "The question is, therefore, distinctly raised, whether a railroad company carrying passengers for hire can lawfully stipulate not to be answerable for their own or their servants' negligence in reference to such carriage." The question, thus

stated with precision, was the question involved, and though, in the discussion of it the argument took a wide range, it is submitted that the question thus stated was the only one decided.

There were, indeed, at the close of the elaborate opinion, several conclusions stated which went beyond the point directly involved, but it has been so often held in this court that nothing is adjudged by a decision but what is presented by the case, that it is assumed that the court is free to qualify some of these conclusions.

The second of these conclusions — which is the one which is claimed to cover the case at bar — " That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants," cannot certainly be reconciled with the *Hart* case without some qualification of its language; for in this latter case an exemption from liability for negligence was held just and reasonable, and therefore valid.   To be sure it was not an exemption from all liability, but it was a substantial and important exemption from liability sustained as lawful because, under the circumstances, just and reasonable.   To harmonize the two cases, then, the above second proposition should read thus: " That it is not just and reasonable, in the eye of the law, for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants, *where the exemption is not in itself just and reasonable.*" And this is substantially the decision in the *Hart* case, that the exemption, being in a contract fairly made, etc., was "a *proper and lawful* mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives," etc. (p. 343).   And in another place, the opinion, after referring to numerous variant decisions, proceeds thus: " Applying to the case in hand the proper test to be applied to *every limitation* of the common law liability of a carrier — *its just and reasonable character* — we have reached the result indicated," which was that the exemption from partial liability for negligence might in that case stand, and then adds: " In Great Britain, a statute directs this test to be ap-

plied by the courts. *The same rule* is the proper one to be applied in this country, in the absence of any statute" (p. 342).

In the third conclusion stated in *Railroad Co.* v. *Lockwood:* "That these rules apply both to carriers of goods and carriers of passengers for hire, *and with special force to the latter*," it seems to be implied that it was the latter case only which was before the court, and that what was said as to carriers of goods might be considered as said *arguendo*.

And some color is given to this view by the language of the learned judge in the case of *Railway Co.* v. *Stevens*, 95 U. S. 655, which was also a case of injury to a passenger. After referring to the case of *Railroad Co.* v. *Lockwood*, the judge says : " We have no doubt of the correctness of the conclusion reached in that case ; " — he does not say " all the conclusions," — and then proceeds as follows : " We are aware that respectable tribunals have asserted the right to stipulate for exemption in such a case : and it is often asked, with apparent confidence, ' May not men make their own contracts, or, in other words, may not a man do what he will with his own ? ' The question at first sight seems a simple one. But there is a question lying behind that, ' Can a man call that absolutely his own which he holds as a great public trust, by the public grant and for the public use, as well as his own profit ? ' The business of the common carrier, in this country at least, is emphatically a branch of the public service, and the conditions on which that public service shall be performed by private enterprise are not yet entirely settled. We deem it the safest plan not to anticipate questions until they fairly arise and become necessary for our decision " (p. 660).

It is submitted that *inland carriers* were here in mind, and that the question now presented had not then arisen.

None of the cases in this court which have arisen in reference to exemptions in contracts for *ocean* navigation of cargo need be specially considered, as none of them go further than to hold, to use the language of Rapallo, J., in a late case, that " when special perils are expected, such as losses by fire, the exception is held not to cover the case of a fire caused by the negligence of the servants of the carrier, unless the intention.

to cover such a case affirmatively appears." *Spinetti* v. *Atlas Co.*, 80 N. Y. 71, 75.

The remark of Gray, J., in *Phœnix Ins. Co.* v. *Erie and Western Transportation Co.*, 117 U. S. 312, may also be cited: "By the settled doctrine of this court, even an express stipulation in the contract of carriage that a common carrier shall be exempt from liability for losses caused by himself and his servants, is unreasonable and contrary to public policy and therefore void" (p. 322).

The remark was not necessary to the decision. The bill of lading in that case contained no such exemption from liability for negligence.

The authority of the *Hart* case, which the learned judge did not refer to, he did not, of course, intend to impugn.

III. — If any law of place governs, it is the law of New York, where the contracts were entered into, or of England, in whose waters the disaster occurred, and where the transportation was to be completed. It must be conceded that under the law, as administered in either of those jurisdictions, the libels should have been dismissed.

That it was not necessary to specially plead that the transaction was governed by the law of England, or some other law than that of New York, seems expressly decided in *Lamar* v. *Micou*, 112 U. S. 452.

In that case this court reversed a decree in equity upon the ground that the law of another State than that of New York governed the case, though that ground was neither *pleaded* nor raised by counsel either below or on an appeal. On motion for a rehearing on this ground, the court said : "The questions so passed upon, though hardly touched by either counsel at the first argument, were vital to the determination of the rights of the parties and *could not be overlooked* by the court." *Lamar* v. *Micou*, 114 U. S. 218, 220. In the present case the facts upon which the point of the *lex loci* is raised are indisputable.

IV. — If, as is ably urged by some of the briefs, there is a maritime law on the subject variant from the common law, then the matter being one of contract between shipper and

carrier to be performed on the high seas, the admiralty courts, at least, should interpret the obligations and validity of the contract by that law; but it is difficult to see how, if the maritime law does so affect the obligations and validity of the contract, any court should refuse to recognize it. It would not be to the praise of the law as a rational department of affairs that the rights of parties under a contract, the terms of which are explicit, should be determined one way in a suit brought in admiralty, and the other way in a suit brought on the common law side of the same tribunal.

Congress not having legislated, there is, it is submitted, no law of the United States on the subject. The Federal courts are supposed to administer the common law or the general commercial law, as the courts of England, and of each of the States having jurisdiction, would administer it, all in the same way, if they were all infallible.

V. The libellants being the underwriters of the cargo, and, being presumed to have knowledge of the clauses in the bills of lading exempting the ship carrier from loss for neglect of the master and mariners, and having with such knowledge taken upon themselves such risk, including barratry, etc., under their policy of insurance, and having received a premium therefor, it would not be just and reasonable that they should be permitted to recover herein. They are equitably estopped.

In *Phœnix Ins. Co.* v. *Erie & Western Transportation Co.*, 117 U. S. 312, Mr. Justice Gray delivering the opinion of the court, is the latest announcement of the views of the court in respect to this subject. The case, it will be remembered, arose out of the stranding of a vessel on Lake Erie, by the gross neglect of the master and mariners, as found by the court. The bills of lading provided that the ship carrier should have the benefit of any insurance effected by the shipper or owner of the property. The Phœnix Insurance Company paid the loss and brought their action against the Erie & Western Transportation Company, owners of the vessel, claiming to be subrogated to the rights of their assured, the shipper, and this court, affirming the decrees below, held that there could

be no recovery, and cited with approval numerous cases in the lower courts to the same effect.   See also *Copeland* v. *New England Ins. Co.*, 2 Met. 432; Parsons Mar. Ins. 14, 18; *Dorr* v. *New Jersey Steam Navigation Co.*, 4 Sandf. 141.

It being well settled (1st) that the ship-owner could have insured this very risk with the libellants, (2d) that the shipper or owner of the cargo could have insured the same risk, and (3d) that there was an agreement between the ship-owner and the owner of the cargo, to give the former the benefit of any insurance effected by the latter, in respect to this portion of the cargo, it is respectfully submitted that it is difficult to find any good reason, resting in public policy or otherwise, why the shipper of goods could not lawfully become his own underwriter, in consideration of a premium paid; or in other words, why a clause in bills of lading like the one in question, is not valid in law.

The ship-owner might have insured this very risk with the libellants, or agreed with the shipper for the benefit of insurance to be effected by him.   The libellants simply took a risk which this assured had taken, presumably with full knowledge on the part of the libellants, and for a consideration which was sufficient in the estimate of the contracting parties; and the libellants have therefore been subrogated simply to the rights and equities of the shipper, to wit, that this particular risk should fall on the shoulders of the shipper and not the ship-owner.

The underwriters' rights rest upon familiar principles of equity.  It is the doctrine of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner. *Hall* v. *Railroad Companies*, 13 Wall. 367, 370.

VI. It appearing that by the provisions of certain bills of lading of the cargo in question, the carrier should have the benefit of any insurance that might have been effected upon or for account of said goods, the libellants cannot recover for such loss.

To be sure these bills of lading provide, as between the carrying companies themselves, when their respective duties shall

end, and enumerate what duties each takes upon itself; but they in no way do away with the clause that that company alone shall be held answerable in whose actual custody the same may be at the time of the happening of the loss, etc., and the carrier so liable shall have the full benefit of any insurance that may have been effected, etc.

This clause was binding between the companies on the one hand and the shipper on the other, and by it the shipper gave the benefit of such agreement to that company in whose possession his goods should be at the time of the happening of such loss. *Lamb* v. *Camden and Amboy Railroad*, 46 N. Y. 290; *Ætna Insurance Co.* v. *Wheeler*, 49 N. Y. 616; *Babcock* v. *Lake Shore Railroad*, 49 N. Y. 491; *Whitworth* v. *Erie Railway Co.*, 87 N. Y. 413.

*Mr. Morton P. Henry*, by leave of court, filed an additional brief on behalf of appellant, in which he maintained:

*First*. That the contracts contained in the bill of lading for shipments by the British vessel Montana are governed by the British law, and not by the law of the forum, and that the shippers are presumed to have contracted with reference to the law of Great Britain.

*Second*. That the contracts in the bills of lading for shipment by the Montana, exempting the owners from liability for loss occasioned by the negligence of their servants, were valid under the law of Great Britain as a defence to these actions on the facts found, and the loss was caused by negligent navigation of the respondent's steamship.

*Third*. That there was sufficient proof on the trial of the cause of the law of Great Britain in the authoritative reports of decisions in the British Courts, which the Circuit Court should have received as evidence of the law of Great Britain as to the validity of the exceptions of liability for negligence of the servants of the owners of British vessels.

*Fourth*. That the absence of the allegation in the pleadings that the law of Great Britain differed from that of the forum was a subject of amendment in any stage of the proceedings, and that this court can permit such amendment to be made in the present stage of the proceedings.

The second and fourth points in his brief were as follows:

II. Is there anything in the methods of procedure and trial of causes in the admiralty courts of the United States which, in a suit against English subjects, forbid such courts in a proper case from deciding the cause in accordance with the law of Great Britain, although the pleadings do not allege that the liability of the respondents is governed by that law, if the facts show that the question is presented for the decision of the court?

The proposed amendment to the answer alleged that the respondents were relieved from liability for the negligence of their servants under these contracts by the law of Great Britain. It was an application to the court, before final decree, to decide that the law of the forum did not apply to the case presented by the finding of the facts.

It is believed that under the decisions of this court, the absence of any such allegation as to the law applicable to these contracts, would not prevent the court from deciding the cause under the foreign law upon the original pleadings, even without amendment, if the facts presented had shown that it was a proper case to apply such law.

And that where justice requires it, this court will give a proper decree upon the facts appearing in the cause, although the allegations may not be supported, and the relief granted differs from that which is asked in the prayer of the libel.

In the case of *Dupont* v. *Vance*, 19 How. 162, a suit was brought to recover the value of cargo which had been jettisoned. It was an action for non-delivery of cargo. It was claimed that the evidence showed that the vessel was unseaworthy. The Circuit Court on appeal from the District Court dismissed the libel, holding that it was a case for contribution by action at law or in equity. The Supreme Court reversed the decree of the Circuit Court, and entered a decree awarding to the libellants their contributory proportion, payable by the vessel in general average. There was no amendment of the libel. But as it appeared by the evidence in the cause that it was a case for general average contribution, such relief was given although not specially asked.

In the case of *The Syracuse*, 12 Wall. 167, it was decided that there is no doctrine of a mere technical variance in the admiralty, and when the allegations of specific negligence are not supported, the court will decide on such facts as are presented by the evidence, when the omission to state material facts did not occasion surprise and was not intentional.

The case of *The Virgin*, 8 Pet. 538, was a suit on a bottomry bond. The Circuit Court held the bond to be invalid for want of authority to execute it, and gave a decree *in personam* for the amount of the advances to the master included in the bond.

These cases illustrate the flexibility of the admiralty procedure to give redress where the facts are fairly before the court, without regard to the allegations when no disadvantage has arisen to the other side from any omission of the allegations or pleadings.

The power of amendment is ample in each court in which the case is heard, at every stage of the proceedings, to permit such an amendment to be made. This arises from the nature of the admiralty appeal which is a trial *de novo*. *The Lucille*, 19 Wall. 73.

It may be fairly urged, that no rules of court can limit the right of appeal in admiralty given by statute, so as to confine the appellant to the facts as alleged in the court below, and change the nature of an appeal. In the Circuit Court on appeal, amendments can be made at any stage of the proceedings ; of which an instance may be given in *The Pennsylvania*, 12 Blatchford, 67, where an amendment was allowed permitting the claimant to claim affirmative damages, which had not been set up in the answer after a mandate from the Supreme Court reversing the decree of the Circuit Court dismissing the libel, and dividing the damages. As there would have been a failure of justice to refuse it, the amendment was allowed.

And the Supreme Court may, in the exercise of its appellate jurisdiction, remand the cause to the Circuit Court to allow new allegations to be made where merits plainly appear, but the case is defective on the pleadings. *The Marianna Flora*, 11 Wheat. 1, at p. 38; *The Mary Ann*, 8 Wheat. 380 : see also *The Adeline*, 9 Cranch, 244, at p. 284.

In the case of *The Julia Blake*, 107 U. S. 418, the action was on a bottomry bond, which was not sustained as to the cargo for want of communication with the owners. After hearing in the Supreme Court, the libellant asked to be allowed to recover for the cargo's proportion of actual advances; but, as there was evidence to show that the loss was occasioned by the unseaworthiness of the vessel, this court refused to remand the cause so as to allow such claim to be set up. It was refused because the evidence did not show merits.

If, therefore, the amendment in this cause should have been allowed to bring the question before the Circuit Court of the United States, this court, in the exercise of its appellate jurisdiction, is competent to allow it now, if in the judgment of the court the facts present a proper case to raise the question.

IV. Will the Admiralty Courts of the United States ascertain the law of England in cases affecting the liability of the owners of English vessels sued in their courts by reference to the English decisions and authorities, or must the English law be proved as a fact by the testimony of experts?   .   .   .

That the laws of England permit ship-owners to stipulate for exemption for loss occasioned by the negligence of their servants is authoritatively settled. *The Duero*, L. R. 2 Ad. & Ec. 393; *Chartered Mercantile Bank of India* v. *The Netherlands India Steam Nav. Co.*, 10 Q. B. D. 521; *Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72; Carver on Carriage by Sea, 101; Maud & Pollock on Shipping, 358; *Carnegie* v. *Morrison*, 2 Met. 381, 404.

Dr. Lushington in the case of *The Peerless*, 1 Lushington, 30, at page 40, expresses his views on this subject. The question was as to a collision which occurred in the river Hooghly. "It is the duty of the court to carry into effect the local laws of the place where the transaction in question occurred; I should therefore pay regard to the local laws of India or Canada, as I would to those of Liverpool or Newcastle. And to ascertain those laws I do not consider that I am bound to require all the strictness of proof which a court of common law would require in proving a foreign law, and for the following reasons:   .   .   .

"Secondly. More especially because in matters of evidence I must look to the practice of my predecessors and the great distinction which prevails between the description of causes which come under the cognizance of the Court of Admiralty and those in other courts. The cases over which the Court of Admiralty exercises jurisdiction occur in all parts of the world, on the high seas and in remote places. It is a well-known principle confirmed by authority that Courts of Admiralty are to proceed *levato velo*, that is with the utmost expedition. In order to carry this principle into effect this court has, both in foreign matters and civil suits, been accustomed to receive evidence which would not have been admitted in other courts."

He subsequently adds: "I think the court may be safely trusted to weigh evidence that might not be so safe to leave to a jury."

In the case of *The J. F. Spencer*, 3 Ben. 337, copies of official surveys, estimates of repairs and report of sale were received in evidence, although in a proceeding at law they would not have been received for any purpose, because "courts of Admiralty are not bound by all the rules of evidence which are applied in the courts of common law, and they may, where justice requires it, take notice of matters not strictly proved."

Also, in *The Boskenna Bay*, 22 Fed. Rep. 662, the terms of a charter-party were allowed to be given in evidence, although it could not have been read in evidence without more formal proof in a court of law.

Also, in accordance with this view the foreign law has been recognized as governing transactions without strict proof, and upon such proofs as are found in the reports of English decisions.

In the case of *The Maud Carter*, 29 Fed. Rep. 156, claims for premiums of insurance and spars used in the construction of a vessel were allowed as a lien upon a British vessel, although according to the decisions in the same circuit the lien would not have been allowed by the law of the United States.

The court says: "This is a British vessel and subject to British law. Under the circumstances it is the duty of the

court to administer and apply the British law exactly as it would be applied if the vessel were in an English court. The court, under the decision in *The Riga*, L. R. 3 Ad. & Ec. 516, must hold that insurance expressly authorized by the owners is a 'necessary,' within the English act defining the jurisdiction of the Admiralty Court, and that under that act it created a maritime lien upon the vessel."

In *The Velox*, 21 Fed. Rep. 479, the admiralty enforced the priority of lien against a Dutch vessel according to the Code of the Netherlands: it does not appear that expert testimony was produced.

In *Covert* v. *Brig Wexford*, 3 Fed. Rep. 577, the court construed the British Merchant Shipping Act, and gave the master of a British vessel a lien on the vessel under that Act of Parliament, which was not given by the law of the forum.

In *The Adolph*, 7 Fed. Rep. 501, the Code of Sweden was applied, giving the crew three months' wages on abandonment of the voyage. These cases, although not in courts of the last resort, show that the Courts of Admiralty have relaxed the rules of evidence as to the proof of the foreign law, as well as of other facts. If stricter proof were required they would be hampered in the exercise of their jurisdiction.

In this court the following judgments show a relaxation of the rule as to the proof of the foreign law. In the case of *Smith* v. *Condry*, 1 How. 28, a suit was brought for a collision between two American ships in the river Mersey. The defence was that The Tasso, the injuring vessel, was in charge of a licensed pilot of the port of Liverpool, whom the master was compelled to take or incur a penalty, or be liable for full pilotage, and the defendants gave in evidence the British statutes, and the court decided it under the construction of the British Pilotage Act in *Carruthers* v. *Sydebotham*, 4 M. & S. 77, that the master was not responsible for the default of the pilot. The court accepted the construction of the Liverpool Pilotage Act without the aid of expert testimony.

In *The Julia Blake*, 107 U. S. 418, the question was as to the validity of a bottomry bond on cargo given by the master of a British vessel at St. Thomas for want of communication

with the owners.    The court says, at p. 426, "Whether, since The Julia Blake was a British vessel, the authority of her master in a Danish port is to be determined by the English law instead of by the general maritime law or the law of Denmark, are questions we deemed unnecessary to consider; for in our opinion even under the most liberal construction of any recognized rule which can be invoked for the authority of the master over the cargo, this bond cannot be sustained."

This case is authority because the court did not refuse to ascertain the law of England if applicable to an English vessel, because it was not proved as a fact.

In *The Maggie Hammond*, 9 Wall. 435, this court enforced a lien against an English vessel for breach of a contract of affreightment made in Scotland without proof of the law of England or of Scotland.

*Mr. William G. Choate* and *Mr. William D. Shipman*, by leave of court, filed a brief for appellant on behalf of the North German Lloyd Steamship Company.   The following are extracts from that brief:

The case now presented to this court is not a question of the common law liability of the common carrier, but a question of the maritime law of the United States.   It is unnecessary to point out to the court that the same rule of liability which governs the question by the common law does not necessarily obtain in the maritime law on a particular point.   The maritime law of the United States is the maritime law of the world, or the law of the whole commercial world in relation to maritime contracts and maritime torts, so far as it has been adopted by or is applicable to the United States.   The common law is the law of England and the United States and the British Colonies.   Its rules have no authority or sanction beyond the limits of the countries in which it belongs, except so far as the judicial or legislative powers of other States may have enacted or declared similar provisions; and in determining what is the maritime law in a point not yet settled it is incumbent upon the court to consider what view of the question is taken by the courts or the commercial codes of all other maritime nations.

It is believed that the foreign law, generally, agrees on this point with that of Great Britain and the State of New York, and differs from the rule of the common law as declared by this court. If this be so, then it would seem to follow, that this court, sitting as a Court of Admiralty, and having regard to the views which obtain among maritime nations on this point, will be bound to hold, that whatever may be the rule of the common law on this subject, the rule of the maritime law permits such a contract as a valid contract between ship and shipper. . . .

It is respectfully submitted, that the dictum of Mr. Justice Gray in *Phœnix Ins. Co.* v. *Erie and Western Transportation Co.*, 117 U. S. 312, overlooks the important consideration, that permitting the insurance removes the sanction for diligence just as certainly and as completely as the stipulation in the bill of lading exempting the ship from liability, and the consideration of public policy which permits the insurance cannot forbid the stipulation. In fact, it is obvious that if the common law rule obtains between the ship and the shipper by the maritime law, and the maritime law permits insurance by the ship-owner against the peril in question, then the ship-owner is allowed to insure against this peril with all the world as underwriters, excepting only the owner of the goods. He alone is forbidden to insure the ship-owner against this peril, by entering into the stipulation in question. This, then, is a public policy which allows itself to be outwitted, which introduces into a system of law a merely arbitrary prohibition between two particular parties without reason to make a certain contract, when it can be made by one of them with all the rest of the world.

From this admitted rule of the maritime law, therefore, allowing the ship-owner to insure, it is a logical and proper inference that the maritime law does not forbid the stipulation between the ship and shipper, for this is merely an insurance by the shipper taking upon himself the risk of this peril for a consideration. . . . .

We do not for a moment assume that this court will be deterred from declaring its own view of the law by any array

of the consequences which may follow its decision. Never-theless, the consequences of a new rule of law, or of extend-ing the operation of an old rule to a new and different field of commerce, are proper to be considered on the question whether the new departure is just and reasonable. . . .

In conclusion, we cannot do better than to refer to the elaborate and luminous opinion of this court in the case of *The Lottawanna*, 21 Wall. 558, delivered by Mr. Justice Brad-ley, in which, while recognizing the fact, that some modifica-tions have been introduced into the Maritime Code by different nations, he enforces with great vigor the doctrine, that "the convenience of the commercial world, bound together as it is by mutual relations of trade and intercourse, demands, that in all essential things wherein those relations bring them in con-tact, there should be a uniform law, founded on natural reason and justice" (p. 572). And, again, "This view of the subject does not, in the slightest degree, detract from the proper authority and respect due to that venerable law of the sea, which has been the subject of such high encomiums from the ablest jurists of all countries; it merely places it upon the just and logical grounds upon which it is accepted, and, with proper qualifications, received with the binding force of law in all countries" (p. 574).

*Mr. Everett P. Wheeler*, by leave of court, filed a brief for appellant on behalf of the Oceanic Steam Navigating Com-pany, citing, *Miller* v. *Tiffany*, 1 Wall. 298; *Junction Rail-road Co.* v. *Bank of Ashland*, 12 Wall. 226; *Bell* v. *Bruen*, 1 How. 169; *Cox* v. *United States*, 6 Pet. 172; *Le Breton* v. *Miles*, 8 Paige, 261; *Burckle* v. *Eckhart*, 3 N. Y. 132; 1 Voet ad Pand. (Paris) 315, lib. 4, tit. 1, § 29; Dig. 44, 7, 21; *Andrews* v. *Pond*, 13 Pet. 65; *Robinson* v. *Bland*, 2 Bur-row, 1077; *Hibernia Bank* v. *Lacombe*, 84 N. Y. 367; *Everett* v. *Vendryes* 19 N. Y. 436; *Rothschild* v. *Currie*, 1 Q. B. 43; *Cooper* v. *Waldegrave*, 2 Beavan, 282; *Boyce* v. *Edwards*, 4 Pet. 111; *Pope* v. *Nickerson*, 3 Story, 465; *Barter* v. *Wheeler*, 49 N. H. 9; *Pomeroy* v. *Ainsworth*, 22 Barb. 118; *Penobscot &c. Railroad* v. *Bartlett*, 12 Gray, 244; *Curtis* v. *Delaware*

*&c. Railroad,* 74 N. Y. 116; *Brown* v. *Camden &c. Railroad,* 83 Penn. St. 316; *Prentiss* v. *Savage,* 13 Mass. 20; *Peninsular & Oriental Co.* v. *Shand,* 3 Moore P. C. (N. S.) 272; *The Harrisburgh,* 119 U. S. 199; *Insurance Co.* v. *Brame,* 95 U. S. 754; *Dennick* v. *Railroad Co.,* 103 U. S. 11; *The Scotia,* 14 Wall. 170; *Woodley* v. *Michell,* 11 Q. B. D. 47; *Peek* v. *North Staffordshire Railway,* 10 H. L. Cas. 473; *The Gaetano & Maria,* 7 P. D. 137, reversing *S. C.* Id. 1; *Lloyd* v. *Guibert,* L. R. 1 Q. B. 115, affg. *S. C.* 6 B. & S. 100; *The Woodland,* 14 Blatchford, 499, affg. *S. C.* 7 Ben. 110; *Crapo* v. *Kelley,* 16 Wall. 610; *Marshall* v. *Murgatroyd,* L. R. 6 Q. B. 31.

*Mr. William Allen Butler* for appellee.

MR. JUSTICE GRAY delivered the opinion of the court.

This is an appeal by a steamship company from a decree rendered against it upon a libel in admiralty, "in a cause of action arising from breach of contract," brought by an insurance company, claiming to be subrogated to the rights of the owners of goods shipped on board the Montana, one of the appellant's steamships, at New York, to be carried to Liverpool, and lost or damaged by her stranding, because of the negligence of her master and officers, in Holyhead Bay on the coast of Wales, before reaching her destination.

In behalf of the appellant, it was contended that the loss was caused by perils of the sea, without any negligence on the part of master and officers; that the appellant was not a common carrier; that it was exempt from liability by the terms of the bills of lading; and that the libellant had not been subrogated to the rights of the owners of the goods.

It is to be remembered that the jurisdiction of this court to review the decree below is limited to questions of law, and does not extend to questions of fact. Act of February 16, 1875, c. 77, § 1; 18 Stat. 315; *The Gazelle,* 128 U. S. 474, 484, and cases there cited.

In the findings of fact, the Circuit Court, after stating, in

much detail, the course of the ship's voyage, the conduct of her master and officers, the position and character of the various lighthouses and other safeguards which she passed, and other attendant circumstances immediately preceding the stranding, distinctly finds as facts: " Those in charge of the navigation of the Montana were negligent, in that, without having taken cross bearings of the light at South Stack, and so determined their distance from the light, they took an east three-quarters south course before passing the Skerries, and without seeing the Skerries light; and in that they continued at full speed after hearing the fog-gun at North Stack; and in that they took a northeast by east magnetic course on hearing said fog-gun, instead of stopping and backing and taking a westerly course out of Holyhead Bay; and in that they did not ascertain their position in Holyhead Bay by means of the lights and fog-signals, or by the use of the lead, or by stopping until they should, by those means or otherwise, learn where their ship was."

" On the foregoing facts," the only conclusion of law stated by the Circuit Court (except those affecting the right of subrogation and the amount to be recovered) is in these words: " The stranding of the Montana and the consequent damage to her cargo having been the direct result of the negligence of the master and officers of the steamer, the respondent is liable therefor." Negligence is not here stated as a conclusion of law, but assumed as a fact already found. The conclusion of law is, in effect, that, such being the fact, the respondent is liable, notwithstanding any clause in the bills of lading.

The question of negligence is fully and satisfactorily discussed in the opinion of the District Court, reported in 17 Fed. Rep. 377, and in that of the Circuit Court, reported in 22 Blatchford, 372. It is largely, if not wholly, a question of fact, the decision of which by the Circuit Court cannot be reviewed here; and so far as it can possibly be held to be or to involve a question of law, it is sufficient to say that the circumstances of the case, as found by the Circuit Court, clearly warrant, if they do not require, a court or jury, charged with the duty of determining issues of fact, to find that the

stranding was owing to the negligence of the officers of the ship.

The contention that the appellant is not a common carrier may also be shortly disposed of.

By the settled law, in the absence of some valid agreement to the contrary, the owner of a general ship, carrying goods for hire, whether employed in internal, in coasting or in foreign commerce, is a common carrier, with the liability of an insurer against all losses, except only such two irresistible causes as the act of God and public enemies. Molloy, bk. 2, c. 2, § 2; Bac. Ab. Carrier, A; *Barclay* v. *Cuculla y Gana,* 3 Doug. 389; 2 Kent Com. 598, 599; Story on Bailments, § 501; *The Niagara,* 21 How. 7, 23; *The Lady Pike,* 21 Wall. 1, 14.

In the present case, the Circuit Court has found as facts: "The Montana was an ocean steamer, built of iron, and performed regular service as a common carrier of merchandise and passengers between the ports of Liverpool, England, and New York, in the line commonly known as the Guion Line. By her, and by other ships in that line, the respondent was such common carrier. On March 2, 1880, the Montana left the port of New York, on one of her regular voyages, bound for Liverpool, England, with a full cargo, consisting of about twenty-four hundred tons of merchandise, and with passengers." The bills of lading, annexed to the answer and to the findings of fact, show that the four shipments in question amounted to less than one hundred and thirty tons, or hardly more than one twentieth part of the whole cargo. It is clear, therefore, upon this record, that the appellant is a common carrier, and liable as such, unless exempted by some clause in the bills of lading.

In each of the bills of lading, the excepted perils, for loss or damage from which it is stipulated that the appellant shall not be responsible, include "barratry of master or mariners," and all perils of the seas, rivers or navigation, described more particularly in one of the bills of lading as "collision, stranding or other peril of the seas, rivers or navigation, of whatever nature or kind soever, and howsoever such collision, stranding or other peril may be caused," and in the other three bills of

lading described more generally as any "accidents of the seas, rivers and steam navigation, of whatever nature or kind soever;" and each bill of lading adds, in the following words in the one, and in equivalent words in the others, "whether arising from the negligence, default, or error in judgment of the master, mariners, engineers or others of the crew, or otherwise howsoever."

If the bills of lading had not contained the clause last quoted, it is quite clear that the other clauses would not have relieved the appellant from liability for the damage to the goods from the stranding of the ship through the negligence of her officers. Collision or stranding is, doubtless, a peril of the seas; and a policy of insurance against perils of the seas covers a loss by stranding or collision, although arising from the negligence of the master or crew, because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that his servants shall use due care to avoid them. *General Ins. Co.* v. *Sherwood*, 14 How. 351, 364, 365; *Orient Ins. Co.* v. *Adams*, 123 U. S. 67, 73; *Copeland* v. *New England Ins. Co.*, 2 Met. 432, 448–450. But the ordinary contract of a carrier does involve an obligation on his part to use due care and skill in navigating the vessel and carrying the goods; and, as is everywhere held, an exception, in the bill of lading, of perils of the sea or other specified perils does not excuse him from that obligation, or exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed. *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344; *Express Co.* v. *Kountze*, 8 Wall. 341; *Transportation Co.* v. *Downer*, 11 Wall. 129; *Grill* v. *General Iron Screw Co.*, L. R. 1 C. P. 600, and L. R. 3 C. P. 476; *The Xantho*, 12 App. Cas. 503, 510, 515.

We are then brought to the consideration of the principal question in the case, namely, the validity and effect of that clause in each bill of lading by which the appellant undertook to exempt itself from all responsibility for loss or damage by perils of the sea, arising from negligence of the master and crew of the ship.

The question appears to us to be substantially determined by the judgment of this court in *Railroad Co.* v. *Lockwood*, 17 Wall. 357.

That case, indeed, differed in its facts from the case at bar. It was an action brought against a railroad corporation by a drover who, while being carried with his cattle on one of its trains under an agreement which it had required him to sign, and by which he was to pay certain rates for the carriage of the cattle, to pass free himself, and to take the risks of all injuries to himself or to them, was injured by the negligence of the defendant or its servants.

The judgment for the plaintiff, however, was not rested upon the form of the agreement, or upon any difference between railroad corporations and other carriers, or between carriers by land and carriers by sea, or between carriers of passengers and carriers of goods, but upon the broad ground that no public carrier is permitted by law to stipulate for an exemption from the consequences of the negligence of himself or his servants.

The very question there at issue, defined at the beginning of the opinion as " whether a railroad company, carrying passengers for hire, can lawfully stipulate not to be answerable for their own or their servants' negligence in reference to such carriage," was stated a little further on in more general terms as " the question before propounded, namely, whether common carriers may excuse themselves from liability for negligence ; " and a negative answer to the question thus stated was a necessary link in the logical chain of conclusions announced at the end of the opinion as constituting the *ratio decidendi*.   17 Wall. 359, 363, 384.

The course of reasoning, supported by elaborate argument and illustration, and by copious references to authorities, by which those conclusions were reached, may be summed up as follows :

By the common law of England and America before the Declaration of Independence, recognized by the weight of English authority for half a century afterwards, and upheld by decisions of the highest courts of many States of the Union,

common carriers could not stipulate for immunity for their own or their servants' negligence. The English Railway and Canal Traffic Act of 1854, declaring void all notices and conditions made by those classes of common carriers, except such as should be held by the court or judge before whom the case should be tried to be just and reasonable, was substantially a return to the rule of the common law.

The only important modification by the Congress of the United States of the previously existing law on this subject is the act of 1851, to limit the liability of ship-owners, (Act of March 3, 1851, c. 43; 9 Stat. 635; Rev. Stat. §§ 4282–4289,) and that act leaves them liable without limit for their own negligence, and liable to the extent of the ship and freight for the negligence or misconduct of their master and crew.

The employment of a common carrier is a public one, charging him with the duty of accommodating the public in the line of his employment. A common carrier is such by virtue of his occupation, not by virtue of the responsibilities under which he rests. Even if the extent of these responsibilities is restricted by law or by contract, the nature of his occupation makes him a common carrier still. A common carrier may become a private carrier, or a bailee for hire, when, as a matter of accommodation or special engagement, he undertakes to carry something which it is not his business to carry. But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier is a corporation created for the purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract about its responsibility does not divest it of that character.

The fundamental principle, upon which the law of common carriers was established, was to secure the utmost care and diligence in the performance of their duties. That end was effected in regard to goods, by charging the common carrier as an insurer, and in regard to passengers, by exacting the highest degree of carefulness and diligence. A carrier who stipulates not to be bound to the exercise of care and diligence seeks to put off the essential duties of his employment.

Nor can those duties be waived in respect to his agents or servants, especially where the carrier is an artificial being, incapable of acting except by agents and servants. The law demands of the carrier carefulness and diligence in performing the service; not merely an abstract carefulness and diligence in proprietors and stockholders who take no active part in the business. To admit such a distinction in the law of common carriers, as the business is now carried on, would be subversive of the very object of the law.

The carrier and his customer do not stand upon a footing of equality. The individual customer has no real freedom of choice. He cannot afford to higgle or stand out, and seek redress in the courts. He prefers rather to accept any bill of lading, or to sign any paper, that the carrier presents; and in most cases he has no alternative but to do this, or to abandon his business.

Special contracts between the carrier and the customer, the terms of which are just and reasonable and not contrary to public policy, are upheld; such as those exempting the carrier from responsibility for losses happening from accident, or from dangers of navigation that no human skill or diligence can guard against; or for money or other valuable articles, liable to be stolen or damaged — unless informed of their character or value; or for perishable articles or live animals, when injured without default or negligence of the carrier. But the law does not allow a public carrier to abandon altogether his obligations to the public, and to stipulate for exemptions which are unreasonable and improper, amounting to an abnegation of the essential duties of his employment.

It being against the policy of the law to allow stipulations which will relieve the railroad company from the exercise of care or diligence, or which, in other words, will excuse it for negligence in the performance of its duty, the company remains liable for such negligence.

This analysis of the opinion in *Railroad Co.* v. *Lockwood* shows that it affirms and rests upon the doctrine that an express stipulation by any common carrier for hire, in a contract of carriage, that he shall be exempt from liability for losses caused

by the negligence of himself or his servants, is unreasonable and contrary to public policy, and consequently void. And such has always been the understanding of this court, expressed in several later cases. *Express Co.* v. *Caldwell*, 21 Wall. 264, 268; *Railroad Co.* v. *Pratt*, 22 Wall. 123, 134; *Bank of Kentucky* v. *Adams Express Co.*, 93 U. S. 174, 183; *Railway Co.* v. *Stevens*, 95 U. S. 655; *Hart* v. *Pennsylvania Railroad*, 112 U. S. 331, 338; *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S. 312, 322; *Inman* v. *South Carolina Railway*, *ante*, 128.

The general doctrine is nowhere stated more explicitly than in *Hart* v. *Pennsylvania Railroad* and *Phœnix Ins. Co.* v. *Erie Transportation Co.*, just cited; and there does not appear to us to be anything in the decision or opinion in either of those cases which supports the appellant's position.

In the one case, a contract fairly made between a railroad company and the owner of the goods, and signed by the latter, by which he was to pay a rate of freight based on the condition that the company assumed liability only to the extent of an agreed valuation of the goods, even in case of loss or damage by its negligence, was upheld as just and reasonable, because a proper and lawful mode of securing a due proportion between the amount for which the carrier might be responsible and the compensation which he received, and of protecting himself against extravagant or fanciful valuations — which is quite different from exempting himself from all responsibility whatever for the negligence of himself and his servants.

In the other, the decision was that, as a common carrier might lawfully obtain from a third person insurance on the goods carried against loss by the usual perils, though occasioned by negligence of the carrier's servants, a stipulation in a bill of lading that the carrier, when liable for the loss, should have the benefit of any insurance effected on the goods, was valid as between the carrier and the shipper, even when the negligence of the carrier's servants was the cause of the loss. Upholding an agreement by which the carrier receives the benefit of any insurance obtained by the shipper from a third person is quite different from permitting the carrier to compel

the shipper to obtain insurance, or to stand his own insurer, against negligence on the part of the carrier.

It was argued for the appellant, that the law of New York, the *lex loci contractus*, was settled by recent decisions of the Court of Appeals of that state in favor of the right of a carrier of goods or passengers, by land or water, to stipulate for exemption from all liability for his own negligence. *Mynard* v. *Syracuse Railroad,* 71 N. Y. 180; *Spinetti* v. *Atlas Steamship Co.,* 80 N. Y. 71.

But on this subject, as on any question depending upon mercantile law and not upon local statute or usage, it is well settled that the courts of the United States are not bound by decisions of the courts of the State, but will exercise their own judgment, even when their jurisdiction attaches only by reason of the citizenship of the parties, in an action at law of which the courts of the State have concurrent jurisdiction, and upon a contract made and to be performed within the State. *Railroad Co.* v. *Lockwood,* 17 Wall. 357, 368; *Myrick* v. *Michigan Central Railroad,* 107 U. S. 102; *Carpenter* v. *Providence Washington Ins. Co.,* 16 Pet. 495, 511; *Swift* v. *Tyson,* 16 Pet. 1; *Railroad Co.* v. *National Bank,* 102 U. S. 14; *Burgess* v. *Seligman,* 107 U. S. 20, 33; *Smith* v. *Alabama,* 124 U. S. 365, 478; *Bucher* v. *Cheshire Railroad,* 125 U. S. 555, 583. The decisions of the State courts certainly cannot be allowed any greater weight in the Federal courts when exercising the admiralty and maritime jurisdiction exclusively vested in them by the Constitution of the United States.

It was also argued in behalf of the appellant, that the validity and effect of this contract, to be performed principally upon the high seas, should be governed by the general maritime law, and that by that law such stipulations are valid. To this argument there are two answers.

First. There is not shown to be any such general maritime law. The industry of the learned counsel for the appellant has collected articles of codes, decisions of courts and opinions of commentators in France, Italy, Germany and Holland, tending to show that, by the law administered in those countries, such a stipulation would be valid. But those decis-

ions and opinions do not appear to have been based on general maritime law, but largely, if not wholly, upon provisions or omissions in the codes of the particular country; and it has been said by many jurists that the law of France, at least, was otherwise. See 2 Pardessus Droit Commercial, no. 542; 4 Goujet & Meyer Dict. Droit Commercial (2d ed.) Voiturier, nos. 1, 81; 2 Troplong Droit Civil, nos. 894, 910, 942, and other books cited in *Peninsular & Oriental Co.* v. *Shand*, 3 Moore P. C. (N. S.) 272, 278, 285, 286; 25 Laurent Droit Civil Français, no. 532; Mellish, L. J., in *Cohen* v. *Southeastern Railway*, 2 Ex. D. 253, 257.

Second. The general maritime law is in force in this country, or in any other, so far only as it has been adopted by the laws or usages thereof; and no rule of the general maritime law (if any exists) concerning the validity of such a stipulation as that now before us has ever been adopted in the United States or in England, or recognized in the admiralty courts of either. *The Lottawanna*, 21 Wall. 558; *The Scotland*, 105 U. S. 24, 29, 33; *The Belgenland*, 114 U. S. 355, 369; *The Harrisburg*, 119 U. S. 199; *The Hamburg*, 2 Moore P. C. (N. S.) 289, 319; *S. C.* Brown. & Lush. 253, 272; *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115, 123, 124; *S. C.* 6 B. & S. 100, 134, 136; *The Gaetano & Maria*, 7 P. D. 137, 143.

It was argued in this court, as it had been below, that as the contract was to be chiefly performed on board of a British vessel and to be finally completed in Great Britain, and the damage occurred in Great Britain, the case should be determined by the British law, and that by that law the clause exempting the appellant from liability for losses occasioned by the negligence of its servants was valid.

The Circuit Court declined to yield to this argument, upon two grounds: 1st. That as the answer expressly admitted the jurisdiction of the Circuit Court asserted in the libel, and the law of Great Britain had not been set up in the answer nor proved as a fact, the case must be decided according to the law of the Federal courts, as a question of general commercial law. 2d. That there was nothing in the contracts of affreightment to indicate a contracting in view of any other law than the

recognized law of such forum in the United States as should have cognizance of suits on the contracts. 22 Blatchford, 397.

The law of Great Britain since the Declaration of Independence is the law of a foreign country, and, like any other foreign law, is matter of fact, which the courts of this country cannot be presumed to be acquainted with, or to have judicial knowledge of, unless it is pleaded and proved.

The rule that the courts of one country cannot take cognizance of the law of another without plea and proof has been constantly maintained, at law and in equity, in England and America. *Church* v. *Hubbart*, 2 Cranch, 187, 236 ; *Ennis* v. *Smith*, 14 How. 400, 426, 427 ; *Dainese* v. *Hale*, 91 U. S. 13, 20, 21 ; *Pierce* v. *Indseth*, 106 U. S. 546 ; *Ex parte Cridland*, 3 Ves. & B. 94, 99 ; *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115, 129 ; *S. C.* 6 B. & S. 100, 142. In the case last cited, Mr. Justice Willes, delivering judgment in the Exchequer Chamber, said : " In order to preclude all misapprehension, it may be well to add, that a party who relies upon a right or an exemption by foreign law is bound to bring such law properly before the court, and to establish it in proof. Otherwise the court, not being entitled to notice such law without judicial proof, must proceed according to the law of England."

The decision in *Lamar* v. *Micou*, 112 U. S. 452, and 114 U. S. 218, did not in the least qualify this rule, but only applied the settled doctrine that the Circuit Courts of the United States, and this court on appeal from their decisions, take judicial notice of the laws of the several States of the Union as domestic laws ; and it has since been adjudged, in accordance with the general rule as to foreign law, that this court, upon writ of error to the highest court of a State, does not take judicial notice of the law of another State, not proved in that court and made part of the record sent up, unless by the local law that court takes judicial notice of it. *Hanley* v. *Donoghue*, 116 U. S. 1 ; *Renaud* v. *Abbott*, 116 U. S. 277, 285.

The rule is as well established in courts of admiralty as in courts of common law or courts of equity. Chief Justice Marshall, delivering judgment in the earliest admiralty appeal in which he took part, said : " That the laws of a foreign

nation, designed only for the direction of its own affairs, are not to be noticed by the courts of other countries, unless proved as facts, and that this court, with respect to facts, is limited to the statement made in the court below, cannot be questioned." *Talbot* v. *Seeman*, 1 Cranch, 1, 38. And in a recent case in admiralty, Mr. Justice Bradley said: "If a collision should occur in British waters, at least between British ships, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was. If not shown, we would apply our own law to the case. In the French or Dutch tribunals they would do the same." *The Scotland*, 105 U. S. 24, 29.

So Sir William Scott, in the High Court of Admiralty, said: "Upon all principles of common jurisprudence, foreign law is always to be proved as a fact." *The Louis*, 2 Dodson, 210, 241. To the same effect are the judgments of the Judicial Committee of the Privy Council in *The Prince George*, 4 Moore P. C. 21, and *The Peerless*, 13 Moore P. C. 484. And in a more recent case, cited by the appellant, Sir Robert Phillimore, said: "I have no doubt whatever that those who rely upon the difference between the foreign law and the law of the forum in which the case is brought are bound to establish that difference by competent evidence." *The Duero*, L. R. 2 Ad. & Ec. 393, 397.

It was, therefore, rightly held by the Circuit Court, upon the pleadings and proofs upon which the case had been argued, that the question whether the British law differed from our own was not open.

But it appears by the supplemental record, certified to this court in obedience to a writ of *certiorari*, that after the Circuit Court had delivered its opinion and filed its findings of fact and conclusions of law, and before the entry of a final decree, the appellant moved for leave to amend the answer by averring the existence of the British law and its applicability to this case, and to prove that law; and that the motion was denied by the Circuit Court, because the proposed allega-

tion did not set up any fact unknown to the appellant at the time of filing the original answer, and could not be allowed under the rules of that court.   22 Blatchford, 402–404.

On such a question we should be slow to overrule a decision of the Circuit Court.   But we are not prepared to say that if, upon full consideration, justice should appear to require it, we might not do so, and order the case to be remanded to that court with directions to allow the answer to be amended and proof of the foreign law to be introduced.   *The Adeline*, 9 Cranch, 244, 284; *The Marianna Flora*, 11 Wheat. 1, 38; *The Charles Morgan*, 115 U. S. 69; *Merchants' Ins. Co.* v. *Allen*, 121 U. S. 67; *The Gazelle*, 128 U. S. 474.   And the question of the effect which the law of Great Britain, if duly alleged and proved, should have upon this case has been fully and ably argued.

Under these circumstances, we prefer not to rest our judgment upon technical grounds of pleading or evidence, but, taking the same course as in *Merchants' Ins. Co.* v. *Allen*, just cited, proceed to consider the question of the effect of the proof offered, if admitted.

It appears by the cases cited in behalf of the appellant, and is hardly denied by the appellee, that under the existing law of Great Britain, as declared by the latest decisions of her courts, common carriers, by land or sea, except so far as they are controlled by the provisions of the Railway and Canal Traffic Act of 1854, are permitted to exempt themselves by express contract from responsibility for losses occasioned by negligence of their servants.   *The Duero*, L. R. 2 Ad. & Ec. 393; *Taubman* v. *Pacific Co.*, 26 Law Times (N. S.) 704; *Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72; *Manchester &c. Railway* v. *Brown*, 8 App. Cas. 703.   It may therefore be assumed that the stipulation now in question, though invalid by our law, would be valid according to the law of Great Britain.

The general rule as to what law should prevail, in case of a conflict of laws concerning a private contract, was concisely and exactly stated before the Declaration of Independence by Lord Mansfield (as reported by Sir William Blackstone, who had been of counsel in the case) as follows: " The general rule,

established *ex comitate et jure gentium*, is that the place where
the contract is made, and not where the action is brought, is to
be considered in expounding and enforcing the contract. But
this rule admits of an exception, when the parties (at the time
of making the contract) had a view to a different kingdom."
*Robinson* v. *Bland*, 1 W. Bl. 234, 256, 258; *S. C.* 2 Bur. 1077,
1078.

The recent decisions by eminent English judges, cited at the
bar, so clearly affirm and so strikingly illustrate the rule, as
applied to cases more or less resembling the case before us,
that a full statement of them will not be inappropriate.

In *Peninsular & Oriental Co.* v. *Shand*, 3 Moore P. C. (N. S.)
272, 290, Lord Justice Turner, delivering judgment in the
Privy Council, reversing a decision of the Supreme Court of
Mauritius, said, " The general rule is, that the law of the coun-
try where a contract is made governs as to the nature, the obli-
gation and the interpretation of it. The parties to a contract
are either the subjects of the power there ruling, or as tem-
porary residents owe it a temporary allegiance; in either case
equally, they must be understood to submit to the law there
prevailing, and to agree to its action upon their contract. It
is, of course, immaterial that such agreement is not expressed
in terms; it is equally an agreement in fact, presumed *de jure*,
and a foreign court interpreting or enforcing it on any con-
trary rule defeats the intention of the parties, as well as
neglects to observe the recognized comity of nations."

It was accordingly held, that the law of England, and not
the French law in force at Mauritius, governed the validity
and construction of a contract made in an English port be-
tween an English company and an English subject to carry
him hence by way of Alexandria and Suez to Mauritius, and
containing a stipulation that the company should not be liable
for loss of passengers' baggage, which the court in Mauritius
had held to be invalid by the French law. 3 Moore P. C. (N.
S.) 278.

Lord Justice Turner observed, that it was a satisfaction to
find that the Court of Cassation in France had pronounced a
judgment to the same effect, under precisely similar circum-

stances, in the case of a French officer taking passage at Hong Kong, an English possession, for Marseilles in France, under a like contract, on a ship of the same company, which was wrecked in the Red Sea, owing to the negligence of her master and crew. *Julien* v. *Peninsular & Oriental Co.*, imperfectly stated in 3 Moore P. C. (N. S.) 282, note, and fully reported in 75 Journal du Palais (1864) 225.

The case of *Lloyd* v. *Guibert*, 6 B. & S. 100; *S. C.* L. R. 1 Q. B. 115; decided in the Queen's Bench before, and in the Exchequer Chamber after, the decision in the Privy Council just referred to, presented this peculiar state of facts: A French ship owned by Frenchmen was chartered by the master, in pursuance of his general authority as such, in a Danish West India island, to a British subject, who knew her to be French, for a voyage from St. Marc in Hayti to Havre, London or Liverpool at the charterer's option, and he shipped a cargo from St. Marc to Liverpool. On the voyage, the ship sustained damage from a storm which compelled her to put into a Portuguese port. There the master lawfully borrowed money on bottomry, and repaired the ship, and she carried her cargo safe to Liverpool. The bondholder proceeded in an English court of admiralty against the ship, freight and cargo, which being insufficient to satisfy the bond, he brought an action at law to recover the deficiency against the owners of the ship; and they abandoned the ship and freight in such a manner as by the French law absolved them from liability. It was held, that the French law governed the case, and therefore the plaintiff could not recover.

It thus appears that in that case the question of the intent of the parties was complicated with that of the lawful authority of the master; and the decision in the Queen's Bench was put wholly upon the ground that the extent of his authority to bind the ship, the freight or the owners was limited by the law of the home port of the ship, of which her flag was sufficient notice. 6 B. & S. 100. That decision was in accordance with an earlier one of Mr. Justice Story, in *Pope* v. *Nickerson*, 3 Story, 465; as well as with later ones in the Privy Council, on appeal from the High Court of Admiralty, in which the

validity of a bottomry bond has been determined by the law prevailing at the home port of the ship, and not by the law of the port where the bond was given. *The Karnak*, L. R. 2 P. C. 505, 512; *The Gœtano & Maria*, 7 P. D. 137. See also *The Woodland*, 7 Benedict, 110, 118, 14 Blatchford, 499, 503, and 104 U. S. 180.

The judgment in the Exchequer Chamber in *Lloyd* v. *Guibert* was put upon somewhat broader ground. Mr. Justice Willes, in delivering that judgment, said: "It is generally agreed that the law of the place where the contract is made is *prima facie* that which the parties intended, or ought to be presumed to have adopted as the footing upon which 'they dealt, and that such law ought therefore to prevail in the absence of circumstances indicating a different intention, as, for instance, that the contract is to be entirely performed elsewhere, or that the subject matter is immovable property situated in another country, and so forth; which latter, though sometimes treated as distinct rules, appear more properly to be classed as exceptions to the more general one, by reason of the circumstances indicating an intention to be bound by a law different from that of the place where the contract is made; which intention is inferred from the subject matter and from the surrounding circumstances, so far as they are relevant to construe and determine the character of the contract." L. R. 1 Q. B. 122, 123; 6 B. & S. 133.

It was accordingly held, conformably to the judgment in *Peninsular & Oriental Co.* v. *Shand*, above cited, that the law of England, as the law of the place of final performance or port of discharge, did not govern the case, because it was "manifest that what was to be done at Liverpool was but a small portion of the entire service to be rendered, and that the character of the contract cannot be determined thereby," although as to the mode of delivery the usages of Liverpool would govern. L. R. 1 Q. B. 125, 126; 6 B. & S. 137. It was then observed that the law of Portugal, in force where the bottomry bond was given, could not affect the case; that the law of Hayti had not been mentioned or relied upon in argument; and that "in favor of the law of Denmark, there

is the cardinal fact that the contract was made in Danish territory, and further, that the first act done towards performance was weighing anchor in a Danish port;" and it was finally, upon a view of all the circumstances of the case, decided that the law of France, to which the ship and her owners belonged, must govern the question at issue.

The decision was, in substance, that the presumption that the contract should be governed by the law of Denmark, in force where it was made, was not overcome in favor of the law of England, by the fact that the voyage was to an English port and the charterer an Englishman, nor in favor of the law of Portugal by the fact that the bottomry bond was given in a Portuguese port; but that the ordinary presumption was overcome by the consideration that French owners and an English charterer, making a charter party in the French language of a French ship, in a port where both were foreigners, to be performed partly there by weighing anchor for the port of loading, (a place where both parties would also be foreigners,) partly at that port by taking the cargo on board, principally on the high seas, and partly by final delivery in the port of discharge, must have intended to look to the law of France as governing the question of the liability of the owner beyond the value of the ship and freight.

In two later cases, in each of which the judgment of the Queen's Bench Division was affirmed by the Court of Appeal, the law of the place where the contract was made was held to govern, notwithstanding some of the facts strongly pointed towards the application of another law; in the one case, to the law of the ship's flag; and in the other, to the law of the port where that part of the contract was to be performed, for the nonperformance of which the suit was brought.

In the first case, a bill of lading, issued in England in the English language to an English subject, by a company described therein as an English company and in fact registered both in England and in Holland, for goods shipped at Singapore, an English port, to be carried to a port in Java, a Dutch possession, in a vessel with a Dutch name, registered in Holland, commanded by a Dutch master and carrying the

Dutch flag, in order to obtain the privilege of trading with Java, was held to be governed by the law of England, and not by that of Holland, in determining the validity and construction of a clause exempting the company from liability for negligence of master and crew; and Lords Justices Brett and Lindley both considered it inmaterial whether the ship was regarded as English or Dutch. *Chartered Bank of India* v. *Netherlands Steam Navigation Co.,* 9 Q. B. D. 118, and 10 Q. B. D. 521, 529, 536, 540, 544.

As Lord Justice Lindley observed: "This conclusion is not at all at variance with *Lloyd* v. *Guibert,* but rather in accordance with it. It is true that in that case the law of the flag prevailed; but the intention of the parties was admitted to be the crucial test; and the law of the ship's flag was considered as the law intended by the parties to govern their contract, as there really was no other law which they could reasonably be supposed to have contemplated. The plaintiff there was English, the defendant French; the *lex loci contractus* was Danish; the ship was French; her master was French, and the contract was in the French language. The voyage was from Hayti to Liverpool. The facts here are entirely different, and so is the inference to be deduced from them. The *lex loci contractus* was here English, and ought to prevail unless there is some good ground to the contrary. So far from there being such ground, the inference is very strong that the parties really intended to contract with reference to English law." 10 Q. B. D. 540.

In the remaining English case, a contract made in London between two English mercantile houses, by which one agreed to sell to the other 20,000 tons of Algerian esparto, to be shipped by a French company at an Algerian port on board vessels furnished by the purchasers at London, and to be paid for by them in London on arrival, was held to be an English contract, governed by English law; notwithstanding that the shipment of the goods in Algiers had been prevented by *vis major,* which, by the law of France in force there, excused the seller from performing the contract. *Jacobs* v. *Crédit Lyonnais,* 12 Q. B. D. 589.

That result was reached by applying the general rule, expressed by Denman, J., in these words: "The general rule is, that where a contract is made in England between merchants carrying on business here, as this is, but to be performed elsewhere, the construction of the contract, and all its incidents, are to be governed by the law of the country where the contract is made, unless there is something to show that the intention of the parties was that the law of the country where the contract is to be performed should prevail;" and summed up by the Court of Appeal, consisting of Brett, M. R., and Bowen, L. J., as follows: "The broad rule is that the law of a country where a contract is made presumably governs the nature, the obligation and the interpretation of it, unless the contrary appears to be the express intention of the parties." 12 Q. B. D. 596, 597, 600.

This court has not heretofore had occasion to consider by what law contracts like those now before us should be expounded. But it has often affirmed and acted on the general rule, that contracts are to be governed, as to their nature, their validity and their interpretation, by the law of the place where they were made, unless the contracting parties clearly appear to have had some other law in view. *Cox* v. *United States,* 6 Pet. 172; *Scudder* v. *Union Bank,* 91 U. S. 406; *Pritchard* v. *Norton,* 106 U. S. 124; *Lamar* v. *Micou,* 114 U. S. 218; *Watts* v. *Camors,* 115 U. S. 353, 362.

The opinion in *Watts* v. *Camors,* just cited, may require a word or two of explanation. It was there contested whether, in a charter party made at New Orleans between an English owner and an American charterer of an English ship for a voyage from New Orleans to a port on the continent of Europe, a clause regulating the amount payable in case of any breach of the contract was to be considered as liquidating the damages, or as a penalty only. Such was the question of which the court said that if it depended upon the intent of the parties, and consequently upon the law which they must be presumed to have had in view, they "must be presumed to look to the general maritime law of the two countries, and not to the local law of the State in which the contract is signed."

The choice there was not between the American law and the English law, but between the statutes and decisions of the State of Louisiana, and a rule of the maritime law common to the United States and England.

Some reliance was placed by the appellant upon the following observations of Mr. Justice Story, sitting in the Circuit Court :

"If a contract is to be performed, partly in one country and partly in another country, it admits of a double aspect, nay, it has a double operation, and is, as to the particular parts, to be interpreted distinctively; that is, according to the laws of the country where the particular parts are to be performed or executed. This would be clearly seen in the case of a bill of lading of goods, deliverable in portions or parts at ports in different countries. Indeed, in cases of contracts of affreightment and shipment, it must often happen that the contract looks to different portions of it to be performed in different countries; some portions at the home port, some at the foreign port, and some at the return port." "The goods here were deliverable in Philadelphia; and what would be an effectual delivery thereof, in the sense of the law, (which is sometimes a nice question,) would, beyond question, be settled by the law of Pennsylvania. But to what extent the owners of the schooner are liable to the shippers for a non-fulfilment of a contract of shipment of the master — whether they incur an absolute or a limited liability, must depend upon the nature and extent of the authority which the owners gave him, and this is to be measured by the law of Massachusetts," where the ship and her owners belonged. *Pope* v. *Nickerson*, 3 Story, 465, 484, 485.

But in that case the last point stated was the only one in judgment; and the previous remarks evidently had regard to such distinct obligations included in the contract of affreightment as are to be performed in a particular port — for instance, what would be an effectual delivery, so as to terminate the liability of the carrier, which, in the absence of express stipulation on that subject, is ordinarily governed by the law or usage of the port of discharge. *Robertson* v. *Jackson*, 2 C. B.

412; *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115, 126; *S. C.* 6 B. & S. 100, 137.

In *Morgan* v. *New Orleans &c. Railroad*, 2 Woods, 244, a contract made in New York, by a person residing there, with a railroad corporation having its principal office there but deriving its powers from the laws of other states, for the conveyance of interests in railroads and steamboat lines, the delivery of property and the building of a railroad in those states, and which, therefore, might be performed partly in New York, and must be performed partly in the other states, was held by Mr. Justice Bradley, so far as concerned the right of one party to have the contract rescinded on account of nonperformance by the other party, to be governed by the law of New York, and not by either of the diverse laws of the other states in which parts of the contract were to be performed.

In *Hale* v. *New Jersey Steam Navigation Co.*, 15 Conn. 538, 546, goods were shipped at New York for Providence in Rhode Island or Boston in Massachusetts, on a steamboat employed in the business of transportation between New York and Providence; and an exemption, claimed by the carrier under a public notice, was disallowed by the Supreme Court of Connecticut, because by the then law of New York the liability of a common carrier could not be limited by such a notice. Chief Justice Williams, delivering judgment, said: " The question is, by what law is this contract to be governed. The rule upon that subject is well settled, and has been often recognized by this court, that contracts are to be construed according to the laws of the state where made, unless it is presumed from their tenor 'that they were entered into with a view to the laws of some other state. There is nothing in this' case, either from the location of the parties or the nature of the contract, which shows that they could have had any other law in view than that of the place where it was made. Indeed, as the goods were shipped to be transported to Boston or Providence, there would be the most entire uncertainty what was to be the law of the case if any other rule was to prevail. We have, therefore, no doubt that the law of New

York, as to the duties and obligations of common carriers, is to be the law of the case."

In *Dyke* v. *Erie Railway*, 45 N. Y. 113, 117, a passenger travelling upon a ticket by which a railroad corporation, established in New York, and whose road extended from one place to another in that state, passing through the States of Pennsylvania and New Jersey by their permission, agreed to carry him from one to another place in New York, was injured in Pennsylvania, by the law of which the damages in actions against railroads for personal injury were limited to $3000. The Court of Appeals of New York held that the law of Pennsylvania had no application to the case ; and Mr. Justice Allen, delivering the opinion, referred to the case of *Peninsular & Oriental Co.* v. *Shand*, before cited, as analogous in principle, and said: " The contract was single and the performance one continuous act. The defendant did not undertake for one specific act, in part performance, in one state, and another specific and distinct act in another of the states named, as to which the parties could be presumed to have had in view the laws and usages of distinct places. Whatever was done in Pennsylvania was a part of the single act of transportation from Attica or Waverly, in the State of New York, to the city of New York, and in performance of an obligation assumed and undertaken in this state, and which was indivisible. The obligation was created here, and by force of the laws of this state, and force and effect must be given to it in conformity to the laws of New York. The performance was to commence in New York, and to be fully completed in the same state, but liable to breach, partial or entire, in the States of Pennsylvania and New Jersey, through which the road of the defendant passed ; but whether the contract was broken, and if broken the consequences of the breach, should be determined by the laws of this state. It cannot be assumed that the parties intended to subject the contract to the laws of the other states, or that their rights and liabilities should be qualified or varied by any diversities that might exist between the laws of those states and the *lex loci contractus*."

In *McDaniel* v. *Chicago & Northwestern Railway*, 24 Iowa,

412, 417, cattle, transported by a railroad company from a place in Iowa to a place in Illinois, under a special contract made in Iowa, containing a stipulation that the company should be exempt from liability for any damage, unless resulting from collision or derailing of trains, were injured in Illinois by the negligence of the company's servants ; and the Supreme Court of Iowa, Chief Justice Dillon presiding, held the case to be governed by the law of Iowa, which permitted no common carrier to exempt himself from the liability which would exist in the absence of the contract. The court said : " The contract being entire and indivisible, made in Iowa, and to be partly performed here, it must, as to its validity, nature, obligation and interpretation, be governed by our law. And by our law, so far as it seeks to change the common law, it is wholly nugatory and inoperative. The rights of the parties, then, are to be determined under the common law, the same as if no such contract had been made."

So in *Pennsylvania Co.* v. *Fairchild,* 69 Illinois, 260, where a railroad company received in Indiana goods consigned to Leavenworth, in Kansas, and carried them to Chicago in Illinois, and there delivered them to another railroad company, in whose custody they were destroyed by fire, the Supreme Court of Illinois held that the case must be governed by the law of Indiana, by which the first company was not liable for the loss of the goods after they passed into the custody of the next carrier in the line of transit.

The other cases in the courts of the several states, cited at the bar, afford no certain or satisfactory guide. Two cases, held not to be governed by a statute of Pennsylvania providing that no railroad corporation should be liable for a loss of passenger's baggage beyond $300, unless the excess in value was disclosed and paid for, were decided (whether rightly or not we need not consider) without much reference to authority, and upon their peculiar circumstances — the one case, on the ground that a contract by a New Jersey corporation to carry a passenger and his baggage from a wharf in Philadelphia across the Delaware River, in which the States of Pennsylvania and New Jersey had equal rights of navigation and

passage, and thence through the State of New Jersey to Atlantic City, was a contract to be performed in New Jersey and governed by the law of that state; *Brown* v. *Camden & Atlantic Railroad*, 83 Penn. St. 316; and the other case, on the ground that the baggage, received at a town in Pennsylvania to be carried to New York city, having been lost after its arrival by negligence on the part of the railroad company, the contract, so far as concerned the delivery, was to be governed by the law of New York. *Curtis* v. *Delaware & Lackawanna Railroad*, 74 N. Y. 116. The suggestion in *Barter* v. *Wheeler*, 49 N. H. 9, 29, that the question, whether the liability of a railroad corporation for goods transported through parts of two states was that of a common carrier or of a forwarder only, should be governed by the law of the state in which the loss happened, was not necessary to the decision, and appears to be based on a strained inference from the observations of Mr. Justice Story in *Pope* v. *Nickerson*, above cited. In a later case, the Supreme Court of New Hampshire reserved any expression of opinion upon a like question. *Gray* v. *Jackson*, 51 N. H. 9, 39.

This review of the principal cases demonstrates that according to the great preponderance, if not the uniform concurrence, of authority, the general rule, that the nature, the obligation and the interpretation of a contract are to be governed by the law of the place where it is made, unless the parties at the time of making it have some other law in view, requires a contract of affreightment, made in one country between citizens or residents thereof, and the performance of which begins there, to be governed by the law of that country, unless the parties, when entering into the contract, clearly manifest a mutual intention that it shall be governed by the law of some other country.

There does not appear to us to be anything in either of the bills of lading in the present case, tending to show that the contracting parties looked to the law of England, or to any other law than that of the place where the contract was made.

The bill of lading for the bacon and hams was made and dated at New York, and signed by the ship's agent there. It

acknowledges that the goods have been shipped " in and upon the steamship called Montana, now lying in the port of New York and bound for the port of Liverpool," and are to be delivered at Liverpool. It contains no indication that the owners of the steamship are English, or that their principal place of business is in England, rather than in this country. On the contrary, the only description of the line of steamships, or of the place of business of their owners, is in a memorandum in the margin, as follows: " Guion Line. United States Mail Steamers. New York: 29 Broadway. Liverpool: 11 Rumford St." No distinction is made between the places of business at New York and at Liverpool, except that the former is named first. The reservation of liberty, in case of an interruption of the voyage, " to tranship the goods by any other steamer," would permit transhipment into a vessel of any other line, English or American. And general average is to be computed, not by any local law or usage, but " according to York-Antwerp rules," which are the rules drawn up in 1864 at York in England, and adopted in 1877 at Antwerp in Belgium, at international conferences of representatives of the more important mercantile associations of the United States, as well as of the maritime countries of Europe. Lowndes on General Average (3d ed.) Appendix Q.

The contract being made at New York, the ship-owner having a place of business there, and the shipper being an American, both parties must be presumed to have submitted themselves to the law there prevailing, and to have agreed to its action upon their contract. The contract is a single one, and its principal object, the transportation of the goods, is one continuous act, to begin in the port of New York, to be chiefly performed on the high seas, and to end at the port of Liverpool. The facts that the goods are to be delivered at Liverpool, and the freight and primage, therefore, payable there in sterling currency, do not make the contract an English contract, or refer to the English law the question of the liability of the carrier for the negligence of the master and crew in the course of the voyage. *Peninsular & Oriental Co.* v. *Shand,* *Lloyd* v. *Guibert,* and *Chartered Bank of India* v. *Netherlands Steam Navigation Co.,* before cited.

There is even less ground for holding the three bills of lading of the cotton to be English contracts. Each of them is made and dated at Nashville, an inland city, and is a through bill of lading, over the Louisville and Nashville Railroad and its connections, and by the Williams and Guion Steamship Company, from Nashville to Liverpool; and the whole freight from Nashville to Liverpool is to be "at the rate of fifty-four pence sterling per 100 lbs. gross weight." It is stipulated that the liability of the Louisville and Nashvnle Railroad and its connections as common carriers "terminates on delivery of the goods or property to the steamship company at New York, when the liability of the steamship commences, and not before;" and that "the property shall be transported from the port of New York to the port of Liverpool by the said steamship company, with liberty to ship by any other steamship or steamship line." And in the margin is this significant reference to a provision of the statutes of the United States, applicable to the ocean transportation only: "ATTENTION OF SHIPPERS IS CALLED TO THE ACT OF CONGRESS OF 1851: 'Any person or persons shipping oil of vitriol, unslacked lime, inflammable matches [or] gunpowder, in a ship or vessel taking cargo for divers persons on freight, without delivering *at the time of shipment* a note in writing, expressing the nature and character of such merchandise, to the master, mate or officer, or person in charge of the loading of the ship or vessel, shall forfeit to the *United States One Thousand Dollars.*'" Act of March 3, 1851, c. 43, § 7; 9 Stat. 636; Rev. Stat. § 4288.

It was argued that as each bill of lading, drawn up and signed by the carrier and assented to by the shipper, contained a stipulation that the carrier should not be liable for losses by perils of the sea arising from the negligence of its servants, both parties must be presumed to have intended to be bound by that stipulation, and must therefore, the stipulation being void by our law and valid by the law of England, have intended that their contract should be governed by the English law , and one passage in the judgment in *Peninsular & Oriental Co.* v. *Shand* gives some color to the argument. 3 Moore P. C. (N. S.) 291. But the facts of the two cases are

quite different in this respect.  In that case, effect was given to the law of England, where the contract was made; and both parties were English, and must be held to have known the law of their own country.  In this case, the contract was made in this country, between parties one residing and the other doing business here; and the law of England is a foreign law, which the American shipper is not presumed to know.  Both parties or either of them may have supposed the stipulation to be valid; or both or either may have known that by our law, as declared by this court, it was void.  In either aspect, there is no ground for inferring that the shipper, at least, had any intention, for the purpose of securing its validity, to be governed by a foreign law, which the is not shown, and cannot be presumed, to have had any knowledge of.

Our conclusion on the principal question in the case may be summed up thus: Each of the bills of lading is an American and not an English contract, and, so far as concerns the obligation to carry the goods in safety, is to be governed by the American law, and not by the law, municipal or maritime, of any other country.  By our law, as declared by this court, the stipulation by which the appellant undertook to exempt itself from liability for the negligence of its servants is contrary to public policy and therefore void; and the loss of the goods was a breach of the contract, for which the shipper might maintain a suit against the carrier.  This being so, the fact that the place where the vessel went ashore, in consequence of the negligence of the master and officers in the prosecution of the voyage, was upon the coast of Great Britain, is quite immaterial.

This conclusion is in accordance with the decision of Judge Brown in the District Court of the United States for the Southern District of New York in *The Brantford City*, 29 Fed. Rep. 373, which appears to us to proceed upon more satisfactory grounds than the opposing decision of Mr. Justice Chitty, sitting alone in the Chancery Division, made since this case was argued, and, so far as we are informed, not reported in the Law Reports, nor affirmed or considered by any of the higher courts of Great Britain.  *In re Missouri Steamship Co.*, 58 Law Times (N. S.) 377.

The present case does not require us to determine what ffect the courts of the United States should give to this conract, if it had expressly provided that any question arising under it should be governed by the law of England.

The question of the subrogation of the libellant to the rights of the shippers against the carrier presents no serious difficulty.

From the very nature of the contract of insurance as a contract of indemnity, the insurer, upon paying to the assured the amount of a loss, total or partial, of the goods insured, becomes, without any formal assignment, or any express stipulation to that effect in the policy, subrogated in a corresponding amount to the assured's right of action against the carrier or other person responsible for the loss; and in a court of admiralty may assert in his own name that right of the shipper. *The Potomac*, 105 U. S. 630, 634; *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S. 312, 321.

In the present case, the libellant, before the filing of the libel, paid to each of the shippers the greater part of his insurance, and thereby became entitled to recover so much, at least, from the carrier. The rest of the insurance money was paid by the libellant before the argument in the District Court, and that amount might have been claimed by amendment, if not under the original libel. *The Charles Morgan*, 115 U. S. 69, 75; *The Gazelle*, 128 U. S. 474. The question of the right of the libellant to recover to the whole extent of the insurance so paid was litigated and included in the decree in the District Court, and in the Circuit Court on appeal; and no objection was made in either of those courts, or at the argument in this court, to any insufficiency of the libel in this particular.

The appellant does, however, object that the decree should not include the amount of the loss on the cotton shipped under through bills of lading from Nashville to Liverpool. This objection is grounded on a clause in those bills of lading, which is not found in the bill of lading of the bacon and hams shipped at New York; and on the adjudication in *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S. 312, that a stipulation in a bill of lading, that a carrier, when liable for a loss of the goods, shall have the benefit of any insurance that may have

been effected upon them, is valid as between the carrier and the shipper, and therefore limits the right of an insurer of the goods, upon paying to the shipper the amount of a loss by stranding, occasioned by the negligence of the carrier's servants, to recover over against the carrier.

But it behooves a carrier setting up such a defence to show clearly that the insurance on the goods is one which by the terms of his contract he is entitled to the benefit of. *Inman v. South Carolina Railway, ante,* 128. The through bills of lading of the cotton are signed by an agent of the railroad companies and the steamship company, "severally, but not jointly," and contain, in separate columns, two entirely distinct sets of "terms and conditions," the first relating exclusively to the land carriage by the railroads and their connections, and the second to the ocean transportation by the steamship. The clause relied on, providing that in case of any loss or damage of the goods, whereby any legal liability shall be incurred, that company only shall be held answerable in whose actual custody the goods are at the time, "and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods," is inserted in the midst of the terms and conditions defining the liability of the railroad companies, and is omitted in those defining the liability of the steamship company, plainly signifying an intention that this clause should not apply to the latter. It is quite clear, therefore, that the appellant has no right to claim the benefit of any insurance on the goods. See *Railroad Co.* v. *Androscoggin Mills,* 22 Wall. 594, 602.

The result of these considerations is that the decree of the Circuit Court is in all respects correct and must be

*Affirmed.*

Mr. Chief Justice FULLER and Mr. Justice LAMAR were not members of the court when this case was argued, and took no part in its decision.