### HEWITT v. SPEYER et al.

(District Court, S. D. New York. August 24, 1917.)

No. 319.

1. Contracts ⊙⟑2—Law Governing—Contracts of Nation.
    Contracts by which a sovereign nation agrees to apply its revenues to the payment of indebtedness created thereby are governed, and their validity and effect must be determined, by the laws of that nation.

2. International Law ⊙⟑12—Claims Against States by Foreign Citizens—Jurisdiction of Courts.
    Contracts by which the republic of Ecuador acquired 49 per cent. of the stock of an American railroad company, which was to build a road

⊙⟑For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in that country, and agreed to "guarantee with its customs revenues" payment of the principal and interest of the company's bonds, *held*, under the law of Ecuador, to be no more than an agreement or engagement to apply such revenues to that purpose, and not to create a lien in favor of the bondholders, which would prevent the government from using any part of the same for necessary governmental purposes, or which could be enforced by a court of the United States against customs funds paid by the government of Ecuador to a New York bank in repayment of money borowed for war purposes.

In Equity. Suit by Erskine Hewitt against James Speyer, Henry Ruhlender, Richard Schuster, and Eduard Beit Von Speyer, individually and as copartners composing the firm of Speyer & Co., and the United States Mortgage & Trust Company, as trustee under the mortgage of the Guayaquil & Quito Railway Company. Bill dismissed.

Masten & Nichols, of New York City (E. Henry Lacombe, Arthur H. Masten, and H. Bartow Farr, all of New York City, of counsel), for complainant.

Cadwalader, Wickersham & Taft, of New York City (Henry W. Taft, Benoni Lockwood, and George Coggill, all of New York City, of counsel), for defendants Speyer & Co.

Harmon, Patterson, Eagle, Greenough & Day, of New York City, for defendant United States Mortgage & Trust Co., as trustee.

AUGUSTUS N. HAND, District Judge. This suit was brought to impress a lien upon moneys in the hands of Speyer & Co. The complainant sues on his own behalf and that of all other bondholders of the Guayaquil & Quito Railway Company under the mortgage dated January 2, 1899, who may join in the prosecution of the cause. The government of Ecuador on June 14, 1897, entered into a contract with Archer Harman for the construction of a railroad from the port of Guayaquil to Quito. By the terms of this contract an American corporation was to be formed. The government of Ecuador was to hold 49 per cent. of the common stock and Harman and his associates 51 per cent. The cost of the road was estimated at $17,532,000, which was to be provided by the issue of $12,282,000 6 per cent. first mortgage bonds and $5,250,000 7 per cent. preferred stock. The common stock was to represent a par value of $7,032,000. The security for the bonds was a first mortgage on the property of the railway and a guaranty by the government of Ecuador which was expressed in the contract as follows:

"The government of Ecuador, on its part, guarantees with its customs revenues the sum of twelve million two hundred and eighty-two thousand American dollars gold, represented by the bonds to be issued; subjecting itself solely to the guaranty prescribed in the present article. This guaranty covers both the principal and the interest at the rate of 6 per cent. per annum, and 1 per cent. per annum for a sinking fund; said amounts to be paid to the trustees provided for in the third article. It is hereby distinctly stated that the government has pledged its customs revenues for the following amounts payable monthly in this form. [Then followed prior guaranties by the government covering existing indebtedness aggregating 104,637.74 sucres.] The above amounts have the right of priority representing both principal and interest for the periods named, over the guaranties constituted in the present

contract; it being understood that the customs revenues at present amount to four million sucres annually. Once said periods have expired, the government agrees to grant priority to the guaranty stipulated in this contract upon the whole of the customs revenues, as soon as the aforesaid sums have been paid. * * * In each bond it shall be distinctly stated that both principal and interest are guaranteed by the government of Ecuador with its customs revenues and a mortgage on the Railway, its properties and appurtenances. * * *"

A supplemental contract was executed between the government of Ecuador and the railway company after its incorporation, dated November 26, 1898, covering the subject-matter of the foregoing arrangement and modifying it in some respects, the terms of which do not need to be dwelt upon. The securities were issued and the bonds guaranteed by the government as called for by the contract. On each bond there was printed the covenant signed by the minister of finance of Ecuador that the government—

"guarantees with its entire custom house receipts, subject only to the prior liens thereon, * * * the payment of the principal of the within bond and of the interest thereon at the rate of 6% per annum, and of 1% per annum for sinking fund, and subject to the liens aforesaid * * * pledges to the United States Mortgage & Trust Company, as trustee, all its said custom house receipts as security for the equal payment of the principal and interest on this bond and all other bonds of this series and also of the aforesaid sinking fund. * * *"

In 1908 the railway was in default in some of its sinking fund and interest payments and a supplemental contract dated September 30, 1908, was made between the government and the railway providing for the issue of $2,486,000 prior lien bonds secured by the property of the company and the guaranty of the government and reducing the interest rate. It provided that the banks in which the customs revenues are deposited should daily set aside and place to the credit of the council for foreign bondholders, as representing the owners of the bonds, one three hundred and sixty-fifth part of the amount required to meet the annual payments on the bonds, and stated that:

"* * * This designation shall constitute a first and preferential charge on the entire customs revenues; and the government hereby declares, that after 31st December, 1908, there will exist no charge on the customs revenues in priority to or ranking pari passu with that designated for the bondholders, and that it will not in future constitute any charge on such revenues to the prejudice of the bondholders' rights."

The prior guaranties were met, but payments for interest and sinking fund again became in default, and under these circumstances the government obtained a loan from Speyer & Co. The latter contracted on December 31, 1910, with the government to purchase 3,000,000 sucres at 85 per cent. of par in treasury certificates secured (1) by 50 per cent. of the export duties; (2) by 500,000 sucres from the liquor tax; (3) all custom house revenues "immediately subject to the liens which they bear up to the present time." This contract was entered into when the government was subjected to unusual expenses for military purposes owing to the hostilities of the republic of Peru and the funds borrowed from Speyer & Co. were used for military and current administration purposes.

The defendants were aware of the guaranty of the bondholders, but proceeded to collect and receive $1,317,728 of customs receipts for application to their loan and held this sum in a special account to await the determination of the bondholders' claims. Speyer & Co. claim that the government of Ecuador is a sovereign power, that it did not and could not hypothecate its revenue, and insist that the claim arising from the default in coupons and sinking fund of $1,047,065 which is secured by the mortgage, should not be satisfied from the moneys in the hands of Speyer & Co.

I can have no doubt that the law of Ecuador, in which the contracts under consideration were made and to be performed, must govern this case as to the substantive rights of the parties. Smith v. Weguelin, 8 Eq. Cas. 198; Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; Scudder v. Union National Bank, 91 U. S. 406, 23 L. Ed. 245. The testimony seems to be conclusive that no pledge of the customs receipts was effected under the general law of Ecuador. The doctrine of notice which obtains in the common law is unknown under the law of Ecuador, and all the witnesses say that a pledge of personal property can only be effected under the general law of Ecuador by physical delivery of the thing pledged. The complainant's expert, Dr. Lazo-Arriaga, did, to be sure, set forth a theory that the intention of the parties should prevail in the absence of an express prohibition, but he evidently regarded the requirements of the Code as to the creation of a pledge as a statutory regulation of the subject-matter, for he said at the close of his testimony:

"Q. Is there any prohibition against the creation of a pledge, where the article pledged is not delivered to the pledgee—is there any prohibition? A. If in a contract say that I give you a pledge, and that pledge is not pledged with you, I naturally draw the contract knowing that the word 'pledge' has a legal meaning, and in such a case that would not be a valid contract. Q. It would not be valid? A. As regards the pledge."

In short, Dr. Lazo-Arriaga relied upon the doctrine he enunciated in answer to question 155, where he said:

"It is possible under the law of Ecuador for Congress to modify that law for a specific case and create a pledge."

He said that the contract of the railroad amounted to a special law of the republic which in terms pledged the revenues in a way that is effective, though unknown to the general laws. While such a theory is ingenious, it involves a construction of the contracts so contrary to the general laws of Ecuador, and one which would result in such a practical nullification of the governmental power to apply public revenues according to the exigencies which might arise, that it should be followed with hesitation. This theory of the rights of the parties would involve the obligation of Ecuador to pay its debts to the bondholders, even though it had no funds with which to conduct a war of defense or to pay the salaries of its officials.

A guaranty can only be enforced in Ecuador against the government by obtaining a decree of the Supreme Court that the customs receipts be appropriated to the bonds and by proceedings before the

248 F.—38

Congress of Ecuador in the nature of impeachment proceedings if the proper officials fail to observe the judicial decree. The procedure in the national Supreme Court, and the resulting process to require application of the revenues to the interest in default, would furnish a means of determining whether any revenues were available for the purpose of paying the sums which were in default. This was the legal and rational means of determining the rights of the bondholders, and not the present form of action.

It is to be observed that there is no language in the contracts of 1897 and 1898, which were all instruments authorized by the Congress of Ecuador, that purported to pledge the customs revenues as security for the bonds represented by complainant. The only language clearly attempting to pledge the customs is found in the bonds and mortgage, and these instruments having been executed in pursuance of the prior contracts of 1897 and 1898, which were made under congressional authorization, must be limited by the terms of these contracts. Complainant contends that the following language of the later contract of September 30, 1908, created a lien:

"This designation shall constitute a first and preferential charge on the entire customs revenues."

The Spanish word translated "charge" was "obligacion." I think this word does not mean "lien," but only obligation or guaranty to pay from the customs receipts. The testimony shows that the language amounted to no more than a promise or executory agreement to pay out of the customs receipts, and that it created no lien. All the witnesses, except Dr. Lazo-Arriaga, agree to this, and in spite of his reputation for knowledge of the law of South American countries, it must be admitted that he had no special knowledge of the law of Ecuador, nor did he seem to speak with the clearest conviction and certainty when he argued that the language of this contract was to be regarded as sufficient to alter rights which would have obtained under the general law of Ecuador as well as other civil law countries. For these reasons I think it cannot be successfully urged that any special law arising from the authorization of the contracts by the Congress of Ecuador resulted in a pledge of the customs revenues. There was a mere agreement to pay out of revenues thereafter to accrue which created no lien. Even though the contracts made by authorization of the Congress of Ecuador would by designating the funds from which payment was to be made create an equitable lien in favor of the bondholders under our laws, no such thing was effected under the law of Ecuador. This court certainly cannot impress the funds with a trust after the government of Ecuador has applied them to payment of its debt to Speyer & Co.

The cases referred to by complainant's counsel, in which the Louisiana courts are held to have a right to enforce equitable remedies, are not a safe precedent for holding that the contracts under consideration created equitable liens in Ecuador. The restricted field which the civil law occupies in Louisiana, surrounded as it is by common-law territory, has naturally caused the introduction of doctrines of the English law which never obtain in foreign nations where the civil-

law system prevails without let or hindrance. I think that the great weight of testimony, as well as the inherent probabilities of the situation, make it most unlikely that a pledge of the entire customs revenues of Ecuador was authorized or effected either by any general or special law applicable to this case. The case of Twycross v. Dreyfus, L. R. 5 Ch. Div. 605, contains an interesting discussion of the power of a court to adjudicate as to the acts of a foreign nation by Lord Jessel, and the Circuit Court of Appeals of this Circuit, in the case of American Banana Co. v. United Fruit Co., 166 Fed. 261, 92 C. C. A. 325, adopted a view similar to that of the English judges, and held that a court could not adjudicate as to such matters. See, also, the opinion of the Supreme Court in Kawananakoa v. Polyblank, 205 U. S. 349, 27 Sup. Ct. 526, 51 L. Ed. 834. In the Twycross Case, Lord Jessel said as to a pledge of its revenues by the republic of Peru:

"Now, what does the bond offer to them [i. e., purchasers of the bonds]? In my opinion, rightly construed, and having reference to the nature of the government which issued it, it did not amount to what, as regards a private individual, could be treated as a mortgage. It says: 'As a guaranty for the fulfillment of the obligations contracted in this bond, the government of Peru, under the national faith' (that means the national honor, the national faith in the sense of good faith), 'pledges the general revenue of the republic, and especially the free proceeds of the guano in Europe and in America, after the engagements which it has contracted on them are covered,' and other property. What is the meaning of the word 'engagement'? First of all, everybody knows that the first engagement a government contracts to pay out of its own revenues is the engagement necessary to continue its own existence as a government to pay for its military and civil services to any extent the government thinks necessary. How can any rational person call that a mortgage or pledge which is preceded by the right of the pledgor to appropriate as much of the property as he pleases to any purpose he thinks desirable for his own use? It is impossible to look upon that seriously as a pledge. It is so much as the government chooses to leave them after satisfying the ordinary engagements and wants of the government. Then there is another stipulation that in all the contracts which the government may enter into for the sale of guano, or under whatever form this sale may have, it binds itself to direct that there be set aside out of the proceeds of each half year a sum sufficient for the service of that same half year, and after such service being secured, to dispose freely of the surplus. That is, the government binds itself to direct it. If it does not direct it you have nothing but the national faith to look to or appeal to. The case beyond that is simply this: It is said the government has sent guano to some agents in Europe, who are made defendants, that these defendants have sold the guano, that they have notice of the bonds, that they claim some charge or lien on the guano—it is not said what it is, because the plaintiff does not know and cannot ascertain—and that the republic makes no claim. All that is perfectly consistent with this, which for aught I know may be the case, that the Peruvian government have borrowed money to more than the amount of the proceeds of the guano from these agents, and that the agents are entitled to retain the proceeds in repayment of that loan, and that loan may be a loan contracted by the government for the purpose of satisfying its most pressing wants and needs, wants which must be satisfied in order to secure the existence of the government as such. All that is perfectly reconcilable with these statements."

The complainant must seek its remedy in the tribunals of Ecuador, where the contract was made, or by diplomatic intervention, and this court cannot question payments made by the government of Ecuador to the defendants. It is urged by complainant that under the Con-

stitution of Ecuador the contract of Speyer & Co.' was unlawful because that instrument forbids the application, even for public defense, of funds appropriated to railroads. This provision of the fundamental law of Ecuador is for the internal regulation of the governmental powers of that republic and cannot be invoked to obtain relief in our courts against the acts of that government, if it has chosen to make an illegal application of its revenue. It is enough to say that the government of Ecuador has done nothing but fail to perform a contract, that no valid pledge was ever created, and that the defendant received payment of its claim and holds the cash paid to it without any lien thereon.

For the foregoing reasons, the bill is dismissed, with costs.